2012 VT 87

**In re Woodstock Community Trust and Housing Vermont PRD (Appeal of Roy et al., Appellant)**

**In re Woodstock Community Trust and Housing Vermont Act 250 Application (Appeal of Roy et al., Appellant)**

[60 A.3d 686]

No. 11-398

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed October 26, 2012

*Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.*, Rutland, for Appellants.

*C. Daniel Hershenson* of *Hershenson, Carter, Scott & McGee, P.C.*, Norwich, for Appellees.

¶ 1. **Dooley, J.** Neighbors of a proposed affordable housing development appeal an Environmental Division decision affirming a decision of the Town of Woodstock Development Review Board (DRB) granting appellee-applicants Woodstock Community Trust and Housing Vermont (hereinafter collectively referred to as WCT) a zoning permit and a decision of the District 3 Environmental Commission, granting an Act 250 land use permit. The Environmental Division had reversed an earlier decision of the

DRB granting a permit,[1] but upon WCT's reapplication, and another favorable decision from the DRB, the Environmental Division affirmed, finding that the deficiencies of the first application had been corrected. Following the second DRB decision, WCT went to the Environmental Commission and obtained an Act 250 permit; the Environmental Division also affirmed the grant of this permit. Neighbors argue that: (1) the successive-application doctrine should have barred the submission of the second zoning permit application; (2) the second application failed to correct the problems of the first application; (3) certain of the Environmental Division's findings with respect to the Act 250 permit were clearly erroneous; (4) the court erred by denying a motion to stay this proceeding; and (5) the Environmental Division erred by conditioning approval on a water easement's location being drawn on the plan. We affirm.

¶ 2. WCT presented its proposed development to the Woodstock DRB in June 2007, and the board approved this initial application. Neighbors of the project appealed the DRB's decision to the Environmental Division, which held that the proposed project failed to meet a number of requirements under the Town of Woodstock Zoning Regulations.[2] The court identified the following problems with the first application: a parking lot contained several spaces that were planned to be built on what the court determined to be a protected wet area, the stormwater disposal system was inadequate, the buffer between the development and properties of neighbors was not sufficient, and there was a lack of ownership and maintenance documents providing for a legal mechanism to protect open space. The court went on to note that WCT could make a future application that addressed the deficiencies in the application.

¶ 3. Several months after this decision, WCT did submit a second application to the DRB, along with an Act 250 permit application to the District 3 Environmental Commission, both of which were subsequently approved. The neighbors appealed both

---

[1] At the time of the first appeal to this body, it was known as the "Environmental Court," but it is now the Environmental Division of the Superior Court. For the purpose of consistency, this opinion will refer to the "Environmental Division," even when discussing the actions of the Environmental Court.

[2] In this opinion, we refer to the zoning regulations in effect at the time of the applications, which were adopted in 2002. These regulations were repealed by Town of Woodstock Zoning Regulations § 104 (2010) and replaced with new ones.

these decisions to the Environmental Division, and the appeals were consolidated. During this second appeal, neighbors moved to stay the proceedings pending the outcome of related property rights litigation in the Civil Division of the Superior Court regarding neighbors' water easements on the development property.[3] The Environmental Division denied the motion to stay, and, in a ruling on cross-motions for summary judgment, concluded that the application was not an impermissible successive application. In its decision after trial, the court went on to conclude that the application sufficiently addressed the court's concerns with the first application, and it granted the permits on the condition that the location of a neighbor's water easement be drawn on the existing conditions plan. This appeal followed.

I

■ ¶ 4. Neighbors first argue that the second application should have been barred by the successive-application doctrine. The successive-application doctrine represents an implementation of issue preclusion, as adapted to the specific context of multiple zoning applications. *In re Armitage*, 2006 VT 113, ¶ 4, 181 Vt. 241, 917 A.2d 437. Issue preclusion serves to prevent the relitigation of issues that have already been settled in a previous action. See *State v. Pollander*, 167 Vt. 301, 304 n.2, 706 A.2d 1359, 1360 n.2 (1997). The successive-application doctrine reflects the necessarily iterative zoning and planning process in that it enforces a more relaxed standard of issue preclusion than is applicable in other contexts.

■ ¶ 5. The basic description of the doctrine is found in *In re Carrier*: "a zoning board . . . 'may not entertain a second application concerning the same property after a previous application has been denied, unless a substantial change of conditions had occurred or other considerations materially affecting the merits' of the request have intervened between the first and second application." 155 Vt. 152, 158, 582 A.2d 110, 113 (1990) (quoting *Silsby v. Allen's Blueberry Freezer, Inc.*, 501 A.2d 1290, 1295 (Me. 1985)). We went on to say in *Carrier* that a second application can be granted "when the application has been substantially changed so as to respond to objections raised in the

---

[3] Neighbors also claimed that they had acquired part of the project land by adverse possession, but they did not prevail on that claim in the superior court.

original application or when the applicant is willing to comply with conditions the commission or court is empowered to impose." *Id.*

¶ 6. Neighbors contend that more recent decisions add an additional element to the successive-application doctrine. See *In re McGrew*, 2009 VT 44, 186 Vt. 37, 974 A.2d 619; *Armitage*, 2006 VT 113. They argue based on these cases that a second application is not allowed if the applicant could have, and should have, included the corrective elements in the first application. We disagree. Indeed, the absence of this additional element is what distinguishes the successive-application doctrine from the more inclusive standard of issue preclusion.

■ ¶ 7. *Armitage* and *McGrew* are examples of cases where there was no change of conditions. In *Armitage*, the first application was denied, in part, because of a traffic deficiency — left turns from the project onto Route 7 would increase traffic volume on that route. 2006 VT 113, ¶ 10. With respect to that deficiency, the revised application had no changes to the development proposal but instead the applicant submitted additional evidence to show that the earlier decision was wrong on this point. In denying the second application, we noted that there was no indication that the additional evidence was unavailable at the time of the first trial. *Id. McGrew* is similar. See 2009 VT 44, ¶¶ 12-13. The point of these decisions is *not* that the second application can be denied where there is a substantial change in the project to meet the first decision any time that the change could have been made before the first decision. Instead, these decisions suggest that even without substantial change in the project there could be a successive application if it is based on new evidence unavailable at the time of the first application.

¶ 8. We turn now to the application of the successive-application doctrine in this case. The Environmental Division denied the initial application because the development proposal did not comply with the local zoning ordinance in four ways.[4] First, the proposal failed to properly buffer the development from adjacent homes as required by Woodstock zoning ordinance § 313(B)(2)(a).

---

[4] In its denial of the first application, the Environmental Division noted that its decision did not preclude WCT from making a second application addressing the listed problems. This is not unlike the court's dismissal "without prejudice" discussed in *Armitage*. See 2006 VT 113, ¶ 6. The inclusion of this language correctly states the law, but does not affect the successive-application analysis.

Second, the proposal failed to satisfy § 313(A)(9)'s requirement for the preservation of wet areas. Third, the proposal violated § 313(A)(8) because it failed to specify how the management and maintenance responsibilities would be divided among the organizations and what legal mechanism would be used to protect the land reserved as private open space. Finally, the stormwater drainage system did not meet the requirements of § 313(A)(5), (C)(3)(h), (C)(3)(i), and § 709(B)(5) because a drainage swale was improperly designed and the developer did not meet its burden of showing that the system would adequately control stormwater and account for its discharge into a nearby brook. Neighbors argue that the successive-application doctrine should have barred the second application because it failed to address these problems and was merely a resubmission of the first application with additional evidence as prohibited by *Armitage*.

¶ 9. The second application had an assortment of changes enumerated in the project narrative submitted to the DRB. The DRB was satisfied with the changes, explicitly rejected the assertion that the second application was impermissible as a successive application, and approved the new plan with a vote of 6-0. Ruling on cross-motions for summary judgment, the Environmental Division, too, found that the changes were substantial enough to overcome the bar of the successive-application doctrine and approved the decision of the review board. We affirm the decision of the Environmental Division.

■■ ¶ 10. The applicant bears the burden of showing changed circumstances. See *Carrier*, 155 Vt. at 158, 582 A.2d at 114. The second application contained various changes that were directed at rectifying the deficiencies identified in the first application by the Environmental Division. In order to rectify the open space buffer between the project and neighboring landowners, the central loop road was tightened, moving the development away from the neighbors and expanding the buffer zone. The central trash and recycling center was also removed as part of the effort to create an adequate buffer. Additionally, the revised application eliminated seven parking spaces to prevent the disturbance of what the Environmental Division determined to be a protected wet area. It also included a draft community declaration which outlined the planned ownership and management structure of the development.

¶ 11. Neighbors particularly focus on the stormwater disposal system, arguing that with respect to this aspect of the plan, WCT

submitted only new evidence for an unchanged proposal. WCT changed the stormwater drainage system in the first application just before trial, and many of the elements of the system were incomplete. The Environmental Division rejected the system in the first application for two reasons. First, with respect to stormwater from the surrounding undeveloped hillsides, the project plan proposed to divert this stormwater around the developed area with the use of a steep and wide drainage swale that would require the cutting down of many trees. The court rejected this swale design. With respect to the runoff from the developed area, the application was sketchy and incomplete. The court ruled that "[i]t is not enough at this final approval stage to explain that the drainage proposal has only recently been redesigned and that any problems can be adjusted during construction." In the second application, WCT redesigned the swale to respond to the objections of the court. It also provided a complete and detailed description of all of the elements of the system, along with permits from the Agency of Natural Resources for the redesigned system.

¶ 12. We agree with both the review board and the Environmental Division that these changes were adequate to constitute a substantial change of conditions. They are in line with what we and other courts have often recognized as sufficient to overcome the principle of the successive-application doctrine. See Carrier, 155 Vt. at 159, 582 A.2d at 114 (holding that redesigned interior road network, reconfigured lots, and updated landscaping were substantial changes); Malmstrom v. Zoning Bd. of Appeals, 207 A.2d 375, 377-78 (Conn. 1965) (holding that change of location for building and parking area, along with parking area's reduced size were change of conditions); Russell v. Bd. of Adjustment, 155 A.2d 83, 88 (N.J. 1959) (holding that five-foot increase in front setback and decrease in lot coverage from eighteen to twelve percent constituted sufficient change); Peterson v. City Council, 574 P.2d 326, 331 (Or. Ct. App. 1978) (holding that smaller building and modified setbacks were change of conditions).

■ ¶ 13. In their brief, neighbors put a great deal of emphasis on the statements of the project architect who characterized the changes to the project as "subtle." Neighbors argue that WCT is bound by this admission, and the court could not find the changes substantial in light of the admission. In fact, the architect's statement, even if it somehow binds WCT, is not inconsistent with

WCT's position. Under the successive-application doctrine, the applicant can change the project to respond to the deficiencies that caused the denial of the permit application however small the changes are in the context of the overall project. Here, the question is not the overall impact of the changes on the project, but instead whether they substantially change individual elements to respond to the deficiencies.

¶ 14. The architect's statements may have some probative value in the evaluation of the changes, but they are far from determinative. They do not preclude WCT's argument and should be given the same weight as any other piece of evidence.

¶ 15. We do acknowledge that part of WCT's presentation on the stormwater system involves a context for the successive-application doctrine that we have not clearly addressed in the past. The redesign of the drainage swale was a substantial change in the stormwater system that responded specifically to a deficiency the court found in the first application. The presentation of the rest of the system, however, specifically the drainage for the run-off of the developed part of the project land, is a full and complete description of what WCT proposed in the first application, now supported by ANR permits. The distinction between this situation and those present in *Armitage* and *McGrew* is that here the first application was denied because it was incomplete, whereas the applications in those cases were complete, and denied on the merits. We conclude that in keeping with the flexibility of successive-application doctrine a second complete application is not precluded by the denial of a prior incomplete application. We recognize in drawing this line that it is somewhat fine and must be carefully applied not to allow a second application because it is better prepared than the former application.

## II

¶ 16. We next address the question of whether the changes in the second application corrected the deficiencies of the first application. We review the Environmental Division's "interpretation of zoning ordinances and findings of fact for clear error." *Armitage*, 2006 VT 113, ¶ 3. We uphold legal conclusions by the Environmental Division that are reasonably supported by the findings. See *In re Eastview at Middlebury, Inc.*, 2009 VT 98, ¶ 10, 187 Vt. 208, 992 A.2d 1014. Neighbors claim that the court's

*conclusions* were clearly erroneous with regard to required parking, the ownership and maintenance documents, and the stormwater disposal system.

¶ 17. In the second application, WCT eliminated seven parking spaces that encroached on what the court determined to be a wet area in its first decision. In order to make up for the lost spaces, applicants created a number of tandem driveways, only wide enough for a single car, but long enough for two cars to park one behind the other. The nature of the tandem driveway requires the back car to move before the front car may exit, but the two spaces in a driveway are both assigned to a single unit. Neighbors claim that the Environmental Division determination that the application satisfied § 520 of the town zoning regulations was clearly erroneous because the tandem driveways could not be counted as two parking spaces.

¶ 18. Neighbors argue that because the driveways are intended to contain two cars, they should properly be characterized as parking lots, which are required by § 520(A)(2) to have at least 250 square feet per car so that the spaces are accessible. Section 520(A)(1) defines a parking space as 9' x 18'. The tandem driveways are designed to be 10' x 36'-40', the size of two parking spaces. This driveway is not large enough to fit the definition of parking lot, but it is not required to. Nothing in the Woodstock zoning ordinance requires a driveway to satisfy the definition of parking lot or otherwise limits it from being counted as several parking spaces for the purposes of site plan review. Because it is not clearly erroneous, we defer to the Environmental Division's interpretation of the ordinance. *In re Wesco, Inc.*, 2006 VT 52, ¶ 7, 180 Vt. 520, 904 A.2d 1145 (mem.) ("We defer to the Environmental Court's interpretation of a zoning ordinance 'unless it is clearly erroneous, arbitrary, or capricious.'") (quoting *In re Cowan*, 2005 VT 126, ¶ 7, 179 Vt. 560, 892 A.2d 207 (mem.)). There is no reason a tandem driveway must be considered a parking lot, rather than two parking spaces arranged in a column. Nor can we conclude that the ordinance prohibits this method of configuring parking so as to meet the number-of-spaces requirement.

¶ 19. Next, neighbors argue that the ownership and maintenance documents do not comply with § 313(A)(8) of the town regulations or Title 27A of the Vermont statutes. Section 313(A)(8) provides in full:

The project land may be owned, leased or controlled either by a single person or corporation or by a group of individuals or corporations. The approved project plan shall be binding on the project land and on present and successive owners. To assure adequate property management and compliance with conditions of project approval:

a. If owned by a group of individuals or corporations, an association shall be formed to assure that all properties and common areas are properly maintained.

b. The filing of a Declaration of Covenants, Conditions, and Restrictions (or its equivalent) may be required.

Town of Woodstock Zoning Regulations § 313(A)(8).

 ¶ 20. Neighbors contend that this section prohibits ownership of separate portions of the project land by separate owners and that the Environmental Division's decision to the contrary was clear error. Neighbors read the introductory sentence of the section as limiting who may own project lands, arguing that the entire land must be owned by one individual or corporation. This interpretation appears to be inconsistent with the language authorizing ownership by a group of individuals or corporations. Moreover, we cannot see any reason for the limitation neighbors urge that the ordinance requires. It would, for example, prohibit a development with single-family housing because the purchaser of a house would own the land. Indeed, this reading would prohibit all condominiums, which are defined as "a common interest community in which portions of the real estate are designated for separate ownership and the remainder of the real estate is designated for common ownership solely by the owners of those portions." 27A V.S.A. § 1-103(8). The real substance of § 313(A)(8) lies in the requirement for an association "to assure that all properties and common areas are properly maintained." The opening sentence is broadly descriptive of the kind of circumstances in which an association is required. WCT has met that requirement here. Neighbors further contend that the declaration does not satisfy § 313(A)(8)(a)'s requirement that "an association shall be formed to assure that all properties and common areas are properly maintained" because it does not provide a mechanism through which the units themselves will be maintained. Town of Woodstock Zoning Regulations § 313(A)(8)(a). Section 8.1 of the

Grange Common Interest Community Declaration provides that the "Association shall at its expense maintain all of the Common Elements . . . in a good state of repair." While maintenance of the units is not provided for, the units are not to be commonly owned. Again, we conclude that neighbors are urging an overly-restrictive construction of the ordinance. The requirement is to form an association, not to regulate how the association functions in detail. We conclude that the requirement is aimed at property owned or controlled by the association.[5] The Environmental Division's interpretation of § 313(A)(8) was not clear error.

¶ 21. Neighbors additionally argue that the declaration violates Title 27A, the Vermont Common Interest Ownership Act, for a number of reasons. Appellants' Statement of Questions submitted to the Environmental Division did not raise this issue, and it was raised for the first time in their Proposed Findings of Facts and Conclusions of Law. This is insufficient to preserve the issue, so we consider it waived. See *Mann v. Levin*, 2004 VT 100, ¶ 26, 177 Vt. 261, 861 A.2d 1138 (holding that when a defendant did not raise the affirmative defense of laches during the factual proceeding and raised it for the first time in proposed findings of fact, the issue was waived for appeal).

¶ 22. Even if the issues were preserved, we fail to see how neighbors can raise compliance with the Common Interest Ownership Act in a zoning proceeding. Nothing in the zoning ordinance requires a landowner to show compliance with the Act in order to obtain a zoning permit. Moreover, we doubt that a municipality could adopt such a requirement. See 24 V.S.A. § 4411 (Zoning bylaws may permit, prohibit, restrict, regulate, and de-

---

[5] We recognize that a declaration could provide that maintenance of individual units not owned by the association is an association responsibility. See 27A V.S.A. § 3-107(a). We believe, however, that the point of the zoning requirement is to ensure that some entity or person is responsible for the maintenance of each part of the property. Consistent with that purpose, the declaration makes the association responsible for maintenance of certain parts of the units — exterior siding, roofs, porches, party walls and driveways — that might not be maintained by individual unit owners. It is consistent with that purpose, and the language of the ordinance, for individual unit owners to be responsible for maintenance of the interior of their units, as provided for by the WCT declaration. Such a reading is consistent with the ordinance as a whole because it does not try, assuming it could, to regulate how housing units outside of common interest communities are maintained.

termine land development.). The Vermont Common Interest Ownership Act has its own private remedies, and there is no suggestion that public, regulatory remedies were intended.[6]

¶ 23. Next we turn to neighbors' argument that the second application did not sufficiently correct the stormwater disposal system problems which the Environmental Division identified in the first application. As we stated above, WCT both changed the stormwater plan and fully documented its original elements. It was changed sufficiently to meet the deficiencies identified in the first decision.

¶ 24. Neighbors argue, however, that the regulations prohibit any increase in discharge into nearby Vondell Brook, and the stormwater system for the developed area will increase the discharge. Section 709(B)(5) of the town zoning regulations requires site plan review to consider "[t]he adequacy of surface drainage facilities." In conducting this review, the Environmental Division noted that state regulations "require that the post-development runoff will be no greater than the pre-development runoff from a project property, but [they] do not limit whether that runoff can be directed to a different location than in the pre-development condition." Neighbors rely on this statement to claim that it means that the amount of stormwater flowing into Vondell Brook cannot increase as a result of the development.

¶ 25. Neighbors' argument is misdirected. State regulations may contain a requirement of runoff neutrality, but the zoning ordinance does not. Moreover, as stated by the court, the requirement is overall net neutrality, not neutrality at every discharge point. Prior to the project, most of the runoff from the property drained through different properties and reached the main river

---

[6] The inappropriateness of raising compliance with Act requirements in a zoning proceeding is clearly demonstrated by the issues neighbors raise. First, neighbors raise that the declaration requires unit owners to purchase a license for use of common elements, but the Act requires that access to common elements be free. Second, neighbors argue that the declaration is illegal because it allocates a larger share of the ownership to declarant and its affiliates than is allowed under the Act. Third, neighbors argue that the declaration allows the subdivision of a unit without any restriction on the number of new units as required by the Act. Fourth, neighbors argue that the declaration does not specifically mention the need to relocate the waterline easements of some of the neighbors. The first three claims involve rights between purchasers and the developers. The neighbors have no legitimate interest in these rights. Neighbors cite no Act requirement for their fourth claim; we cannot see one.

through a different brook or by overland flow from Route 4. The court conducted a thorough review of the discharge into Vondell Brook and concluded it would adequately handle the surface runoff, even in flooding conditions. Neighbors do not challenge this analysis, and we find no error in it.

¶ 26. We note that, prior to submitting the new permit application, WCT obtained a stormwater discharge permit from the Vermont Agency of Natural Resources, specifically authorizing the discharge into Vondell Brook. WCT also obtained a stormwater construction permit for the period when the project is under construction. Under Act 250 Rule 19, the permits create a rebuttable presumption that the project meets relevant Act 250 criteria. See 10 V.S.A. §§ 6086(d), 8504(i). Relying upon the presumption, the Environmental Division concluded that the project met the relevant Act 250 criteria with respect to stormwater. In doing so, the court noted that neighbors failed to provide expert evidence to rebut the presumption created by the permits.

¶ 27. Neighbors finally contend that the project's density violates the town zoning regulations. The regulations require that "[t]he proposed development must be designed to create a stable and desirable environment that is in harmony with the density and type of adjacent land uses." Town of Woodstock Zoning Regulations § 313(A)(1). The parcel to be developed is zoned as Residential Medium Density, a zone that the Environmental Division pointed out, "not only allows but promotes a density of development consistent with the design of this project." The court found:

> The neighborhood or visual context of the project is the hamlet or settlement of West Woodstock. . . . Most of the settlement is located close to and focused towards the valley floor and Route 4, surrounded by predominantly wooded hillsides and open fields, with views from the valley floor of the wooded hillsides and more distant wooded hills. A large middle and high school complex with a community indoor arena, and a cluster housing development of 33 units, are located southwesterly of the project property on either side of Route 4. . . .
>
> In the area of the proposed project, the hamlet of West Woodstock contains a relatively dense group of residential and residential-style buildings on small lots,

11/2 to 21/2 stories in size, diverse but traditional in design with characteristic gabled roofs, porches, additions, and dormers. The proposed designs for the project buildings are compatible in size and style with the existing properties in the area. Although they are by definition all new, they have been designed with a diversity of building types, roof forms, and architectural details, to reflect and be compatible with the diverse elements of the neighboring vernacular architecture.

The project has been designed to cluster the new residential buildings on the flatter portion of the site, and to preserve the upland fields and forested areas as open space. . . . The new residential buildings surround a small common area and face an inner loop road, giving the project the appearance and functionality of a small neighborhood, consistent with the neighborhood along Route 4. The project has been redesigned so that the back yards of the new houses, and an area of community gardens, adjoin the back yards of [neighbors'] . . . existing houses along Route 4, reinforcing the neighborhood design. . . .

The density of project buildings is consistent with the density of buildings in the existing neighborhood. . . .

¶ 28. Even if the Environmental Division accepted neighbors' assertion that the project could add as many as 140 new residents to West Woodstock, it was not reversible error to find the project harmonious with adjacent land uses. The court's findings are fully supported by the evidence and the conclusions are supported by the findings. The density of the buildings is consistent with the zoning ordinance and "in harmony with the density and type of adjacent land uses" as required by § 313(A)(1).

¶ 29. In conclusion, the second application substantially dealt with all of the identified problems of the first application, and we will not overturn the Environmental Division when there is no clear error.

III

¶ 30. Having determined that the court did not err in determining that the second application successfully corrected the

insufficiencies of the first, we turn to neighbors' argument that the Environmental Division's factual findings with respect to the Act 250 permit constituted error. "[W]e will overturn these findings only where the appellant shows 'that there is no credible evidence to support them.'" *In re Entergy Nuclear Vt. Yankee Discharge Permit 3-1199*, 2009 VT 124, ¶ 15, 187 Vt. 142, 989 A.2d 563 (quoting *In re Miller Subdivision Final Plan*, 2008 VT 74, ¶ 13, 184 Vt. 188, 955 A.2d 1200). Neighbors first argue that the court's findings with regard to aesthetics and harmony with adjacent land uses were clearly erroneous.

■■■ ¶ 31. The only issue neighbors have raised on appeal relative to the Act 250 permit is their contention that the project violates Criterion 8 of Act 250. The criterion requires a court to find that a project will not result in "undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas," before upholding the Act 250 permit. 10 V.S.A. § 6086(a)(8). In *In re Times & Seasons, LLC*, we described a two-pronged test the court should use when determining if this element of Act 250 is satisfied: "[I]t determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue." 2008 VT 7, ¶ 8, 183 Vt. 336, 950 A.2d 1189. The Environmental Division used this so-called "Quechee Test" and determined that the project did not fail under either of the prongs of the test. First, the court found that the project would not result in an adverse impact because the project was designed with buildings that matched local architecture[7] and preserved upland fields and forested hillsides visible to passing travelers. Neighbors have not directly challenged this conclusion, and it is alone sufficient to uphold the project against the Criterion 8 challenge.

■■ ¶ 32. Second, the court concluded that if there were an adverse impact, it was not undue. It relied upon the standard from *Times & Seasons*:

An adverse impact is considered undue if *any one* of the three following questions is answered in the affirmative:

---

[7] In making their argument, neighbors describe the project as a "congested collection of buildings with a Disney like effort to mimic a New England village." We find this characterization greatly exaggerated. It and other similar mischaracterizations do not help neighbors' cause.

(1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

*Id.* Neighbors respond that the planned development violates a clear, written community standard, relying on the 2007 Woodstock Town Plan, which provides, "Of prime importance to the quality of life and character of Woodstock are its open spaces, which include not only open fields and meadows, but also wooded hillsides, forests, stream corridors and other natural vistas." Woodstock, Vt., Town Plan 76 (2007).

¶ 33. We will address this argument, although we find no indication that it was raised below. In doing so, we accept that the open space language is intended, in part, to protect the aesthetics of the Town. We do not, however, take the quoted plan language as a clear, written community standard that no currently open space can be developed anywhere in Woodstock. Under such a standard, virtually no housing could be built on land that is undeveloped.[8] Yet, the zoning regulations that regulate development have no prohibition on development of currently open land in this zone. See *Eastview at Middlebury*, 2009 VT 98, ¶ 21 (project meets Criterion 8, in part, because it is allowed by the zoning ordinance); 10 V.S.A. § 6086(a)(10) (where town plan is vague, commission can consider bylaws for interpretation). Nor do we think the plan language clearly protects from development a ball field that is behind a row of houses on a state highway and barely visible to the public. As the court noted, the project protects the important part of the landscape in the area — the hillsides and forested land — and is designed to be consistent with the surrounding residential development.

---

[8] As often happens in town plans, the language supports policies that are sometimes in conflict. Thus, the Woodstock plan provides that "Woodstock needs additional affordable housing units for its current residents and employees in order to maintain a broad social-economic base." Woodstock, Vt., Town Plan 59 (2007). That the plan does not attempt to resolve a conflict in objectives, when it occurs, is evidence that it does not set a "clear" community standard.

¶ 34. The Environmental Division decision that there was no undue adverse aesthetic impact was not clearly erroneous.

## IV

¶ 35. We now address neighbors' claim that the Environmental Division erred in its denial of their motion to stay the proceedings. Neighbors made the motion in March 2010, shortly before WCT filed its motion for summary judgment on the successive-application issue. Neighbors sought a stay of this proceeding until a related action in the superior court regarding water easements on the project property reached an end. Neighbors argued that the superior court action, which they filed against WCT, could have as a result a blocking of the proposed project and they should not have to incur the expense of a trial in this action as long as that possibility was present. They acknowledged that the separate litigation was likely to take years to reach its end point. The court denied the motion with respect to summary judgment proceedings to determine whether the successive-application doctrine·prohibited going forward with consideration of the project. The court added: "As the pretrial work in these cases progresses, and depending on the decision on summary judgment in the superior court case, the court will entertain specific future motions to coordinate the scheduling and resolution of these cases with that of the [s]uperior court case as efficiently as possible, including any requests to postpone the trial dates that will be scheduled for these cases." There is no indication in the docket entries that neighbors made any motions to coordinate scheduling the cases or to delay the trial in this case.

¶ 36. A stay in this context is a "suspension of proceedings" until a specified event occurs in another case. See *Stone v. Briggs*, 112 Vt. 410, 412-13, 26 A.2d 828, 830 (1942). It is in the nature of a continuance. We have held that a ruling on a motion to continue involves trial court discretion and will be overturned only if the discretion is "exercised upon grounds clearly untenable, or to an extent clearly unreasonable." *Kokoletsos v. Frank Babcock & Son, Inc.*, 149 Vt. 33, 35, 538 A.2d 178, 179 (1987) (quotations omitted). As the United States Supreme Court held in the leading case of *Landis v. North American Co.*, 299 U.S. 248, 254 (1936), every court has the power "to control the disposition of the causes on its docket." But, how this best can be done "calls for the exercise of

judgment" and the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward" if there is a possibility that a stay will damage someone else. *Id.* at 254-55. "Courts disapprove stays . . . when a lesser measure is adequate to protect the moving party's interests." *In re Application for Water Rights*, 101 P.3d 1072, 1082 (Colo. 2004).

¶ 37. In this case, the ground for the stay asserted by neighbors related to the expenses of a trial, particularly the employment of expert witnesses. Thus, the court properly concluded that it would allow, and would decide, a motion for summary judgment with respect to the application of the successive-application doctrine. The issue to be decided was one of law, and the record before it was generally sufficient to make that decision. We see no abuse of discretion in allowing the summary judgment process on this issue to go forward.

¶ 38. Beyond resolution of that preliminary issue, the court recognized the circumstances neighbors were in and offered methods to ameliorate any difficulty neighbors would face in trying both cases. At the same time it recognized that neighbors had filed both cases and WCT had a right to efficient consideration of its permit application. Neighbors did nothing to take advantage of the court's offer. In these circumstances, we see no decision to review. Even if there were an adverse decision, we hold that the court acted within its discretion.

¶ 39. We have answered neighbors' argument as it was presented to the trial court. As is common in this appeal, however, neighbors have reframed the issue for the first time in this Court. Neighbors note that the case went to trial in the superior court with a jury verdict in July 2010 that the project unreasonably interfered with the water rights of one of the neighbors. Based on that event, the neighbors argue that the Environmental Division committed error by not staying the proceeding as of that time. There is, however, no indication that neighbors renewed their motion in the trial court. Moreover, there was a clear dispute over the significance of the jury verdict since the superior court still had to consider injunctive relief, that is, whether WCT could move the water line, and the two trials became separated by a number of months. It is sufficient to hold that neighbors have waived this argument by raising it for the first time on appeal and by failing to obtain an adverse ruling from the trial court.

## V

¶ 40. Finally, we turn to neighbors' contention that the Environmental Division acted outside its jurisdiction when it required WCT "to add the location of the Smith spring rights to the appropriate existing conditions plan, together with any necessary note regarding the pendency of litigation over the Smith spring rights or easement." The parties agree that the Environmental Division does not have jurisdiction to determine private property rights. See *Nordlund v. Van Nostrand*, 2011 VT 79, ¶ 17, 190 Vt. 188, 27 A.3d 340. The aforementioned condition, however, does not affect private property rights; rather, it merely requires WCT to map already existing rights pursuant to the Woodstock zoning regulations. Town of Woodstock Zoning Regulations § 313(C)(3).

¶ 41. It is entirely within the jurisdiction of the Environmental Division to impose conditions on permits. See *Entergy*, 2009 VT 124, ¶ 54. The location of certain easements was in dispute when the court imposed this condition, but requiring the easements to be drawn on the existing conditions plan does not constitute a property-rights adjudication. Furthermore, the Environmental Division was sensitive to the concurrent litigation when it imposed the condition, requiring that the pending litigation be noted on the plan. The condition was based on the requirements of the Woodstock zoning ordinance, and it was within the court's jurisdiction and discretion to require it.

*Affirmed.*