NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 72

No. 2020-197

| | |
|---|---|
| In re Snowstone, LLC Act 250 Jurisdictional Opinion (Michael Harrington, et al., Appellants) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | December Term, 2020 |

Thomas S. Durkin, J.

Merrill E. Bent of Woolmington, Campbell, Bent & Stasny, P.C., Manchester Center, for
  Appellants.

Lawrence G. Slason of Law Office of Salmon & Nostrand, Bellows Falls, for Appellee.

David R. Cooper of Facey Goss & McPhee P.C., Rutland, for Appellees/Intervenors Justin and
  Maureen Savage.

Melanie Kehne, Assistant Attorney General, Montpelier, for Vermont Natural Resources Board.


PRESENT:  Robinson, Eaton, Carroll and Cohen, JJ., and Morris, Supr. J. (Ret.),
                Specially Assigned

¶ 1.    **COHEN, J.**   In this case, we affirm the Environmental Division's conclusion that a stone quarry on less than an acre of land within a larger unimproved parcel does not constitute "development" in a municipality that has not adopted permanent zoning and subdivision bylaws, and therefore does not require an Act 250 permit.

¶ 2.    The Environmental Division made the following findings based on evidence introduced at a merits hearing.  Justin and Maureen Savage (landowners) own a 176-acre parcel of

undeveloped land in a rural area near Cavendish, Vermont. Snowstone, LLC, seeks to buy a portion of landowners' property to operate a dimensional stone extraction project. To that end, Snowstone and landowners executed a contract whereby, subject to several contingencies, Snowstone would purchase a 0.64-acre portion of landowner's property containing the stone quarry and a 0.29-acre access easement over an existing road within the property. The combined acreage of the proposed project is accordingly 0.93 of an acre, all contained within the 176-acre parcel. There are no other commercial or industrial improvements on the 176 acres or in the vicinity.

¶ 3. After executing the contract, Snowstone requested a jurisdictional opinion from the Act 250 district coordinator to determine whether the project would need an Act 250 permit. See 10 V.S.A. § 6007(c) (authorizing jurisdictional opinions). A group of neighboring landowners (neighbors) filed comments, arguing that the project would require said permit.

¶ 4. The district coordinator issued a jurisdictional opinion, concluding that the proposed project needed an Act 250 permit because the project constituted "development," defined in relevant part as "[t]he construction of improvements for commercial or industrial purposes on more than one acre of land within a municipality that has not adopted permanent zoning and subdivision bylaws." Id. § 6001(3)(A)(ii).[1] Applying this Court's analysis in In re Vitale, which we discuss below, the district coordinator determined that the project land and the remainder of the 176-acre parcel would be controlled by the same person and thus both had to be considered together under § 6001(3)(A)(ii). 151 Vt. 580, 563 A.2d 613 (1989). The district coordinator concluded that both parcels would be controlled by the same person because, in his estimation, the contract between Snowstone and landowners was not an "arms-length transaction" due to the purchase price, a clause granting landowners a right of first refusal to buy back the project land,

---

[1] The parties have always agreed that Cavendish is such a municipality.

and a deed restriction precluding any development of the project land after stone extraction was completed. In short, the district coordinator determined that given the nature of their transaction, Snowstone and landowners remained "effectively affiliated for profit in the nature of a joint venture," and that this required the entire 176 acres to be considered under § 6001(3)(A)(ii).

¶ 5. Snowstone appealed the jurisdictional opinion to the Environmental Division (the JO appeal) and presented the court with a revised contract that reduced the purchase price, removed the right of first refusal, and excised the deed restriction. Neighbors successfully intervened, arguing that the two parcels would be controlled by the same person due to the nature of the sales transaction, that the retained parcel would be "involved land"—a term we explain below—and that the project would require a stormwater discharge permit with stormwater treatment facilities that would increase the amount of land necessary to operate the project beyond one acre.

¶ 6. The court held a merits hearing on these issues and, after Snowstone's case-in-chief, agreed with the parties to bifurcate the matter. First, the court would determine whether the proposed project would need an Act 250 permit because of the nature of the transaction between Snowstone and landowners, and whether the retained parcel would be involved land. Second, the court would order Snowstone to obtain the necessary stormwater permits, and it would revisit the stormwater issue if the permit requirements indeed increased the land area necessary for the project beyond one acre.

¶ 7. And so, it was. In an initial merits order, the court declined to apply the concept of "involved land" because the term—though present in other sections of Act 250—is absent from § 6001(3)(A)(ii) and, putting aside the stormwater issue, the project would be contained in less than an acre. The court then scrutinized the revised sales contract and determined that, with the excision of the former objectionable provisions, the contract evinced an arms-length transaction such that Snowstone and landowners were not one person. Accordingly, the court concluded that the entire 176 acres did not need to be considered under § 6001(3)(A)(ii) and thus the project did

3

not require an Act 250 permit. The court then directed Snowstone to obtain the necessary stormwater permits and inform the court and neighbors of the permit determination within ten days of that determination. It further ordered:

> Within thirty (30) days of [the stormwater permit] determination or withdrawal, any [p]arty to this jurisdictional opinion appeal may request that the [c]ourt conduct a further hearing on whether any stormwater permit determination has a relevancy to the legal issue of whether all activities necessary for the operation of the proposed dimensional stone quarry can occur within the 0.93 [of an acre] that Snowstone proposes to purchase.

The court warned that if no party requested such a hearing, it would issue a final judgment in the JO appeal.

¶ 8. Snowstone applied for the stormwater permit and neighbors intervened in those proceedings, filing questions and comments. On June 12, 2019, the Department of Environmental Conservation granted Snowstone a multisector general permit (MSGP), authorizing the discharge of stormwater with all treatment activities contained within the 0.93 of an acre. Neighbors submit that they never received Snowstone's notification of the permit determination, and the record does not reflect that the notification was provided to the court or to neighbors. However, we take judicial notice that on July 5, 2019, neighbors filed a notice of appeal from the grant of the permit to the Environmental Division in a separately docketed matter (the MSGP appeal). See V.R.E. 201(b) (authorizing judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); Miller v. Miller, 2008 VT 86, ¶ 31 & n.11, 184 Vt. 464, 965 A.2d 524 (taking judicial notice of family court order issued during pendency of appeal and of fact that party was sentenced in federal court). Despite neighbors' knowledge of the permit determination by at least July 5th, the thirty-day deadline to request a hearing in the JO appeal passed, and neighbors did not file a request to conduct a further hearing. However, forty-four days after the permit determination, on July 26, 2019, neighbors filed a

4

motion to consolidate the JO and MSGP appeals. Following neighbors' request for a site visit, landowners sought and were granted intervention in the JO appeal.

¶ 9. In a subsequent order, the court rejected neighbors' contention that their motion to consolidate qualified as a request for a further hearing in the JO appeal, noting that the motion did not specify a request for further hearing and in any event was filed beyond the thirty-day deadline. In the MSGP appeal, the court dismissed the matter for lack of standing. The Environmental Division thus entered judgment for Snowstone in the JO appeal, ruling that, for the reasons noted in its initial merits order, the proposed project did not require an Act 250 permit.[2]

¶ 10. Neighbors now appeal to this Court, advancing two premises for their argument that the proposed project constitutes "development" under 10 V.S.A. § 6001(3)(A)(ii). First, they contend that the landowners' retained parcel is "involved land" because the access easement will provide the only access to the quarry parcel. As a consequence, the entire tract of the retained parcel must be used in calculating the amount of land required for the project. Second, neighbors argue that the two parcels must be considered together because the sales contract was not an arm's-length transaction, such that the parcels are really controlled by one person. Separately, neighbors maintain that the Environmental Division erred in determining that neighbors failed to request an additional hearing in the JO appeal concerning the stormwater treatment and project-footprint issues. Finally, they argue that the court abused its discretion in permitting landowners to intervene.

---

[2] In <u>In re Snowstone LLC Stormwater Discharge Authorization</u>, this Court reversed the Environmental Division's dismissal of the MSGP appeal for lack of standing and remanded the matter for consideration on the merits. 2021 VT 36, ¶ 19, __ Vt. __, __ A.3d __. That matter is currently pending in the Environmental Division. We assume for purposes of this opinion that the project will require only 0.93 of an acre of land. Nothing we say here should be construed as precluding the need for a permit if the project will in fact require more land because of stormwater treatment facilities or because of any other reason.

## I. Interpretation of 10 V.S.A. § 6001(3)(A)(ii)

¶ 11. We first consider whether the proposed project constitutes "development" under § 6001(3)(A)(ii). Our review of the Environmental Division's legal conclusions is nondeferential. In re N.E. Materials Grp., LLC, 2019 VT 55, ¶ 6, 210 Vt. 525, 217 A.3d 541. Because that court "determines the credibility of witnesses and weighs the persuasive effect of evidence," this Court "will not overturn its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous, meaning that there is no credible evidence to support them." In re N.E. Materials Grp. LLC Act 250 JO # 5-21, 2015 VT 79, ¶ 18, 199 Vt. 577, 127 A.3d 926 (quotations omitted).

¶ 12. In interpreting statutes, our task is to effectuate the intent of the Legislature. Agency of Transp. v. Timberlake Assocs., 2020 VT 73, ¶ 11, __ Vt. __, 239 A.3d 253. "If the intent of the Legislature is apparent on the face of the statute because the plain language of the statute is clear and unambiguous, we implement the statute according to that plain language." Flint v. Dep't of Labor, 2017 VT 89, ¶ 5, 205 Vt. 558, 177 A.3d 1080. We read statutory language in context, especially one component of a broader statutory scheme, to ensure a harmonious whole. State v. Davis, 2020 VT 20, ¶ 47, 211 Vt. 624, 230 A.3d 620; see also Lyons v. Chittenden Cent. Supervisory Union, 2018 VT 26, ¶ 13, 207 Vt. 59, 185 A.3d 551 (explaining that legislative intent is discerned "by examining and considering fairly, not just isolated sentences or phrases, but the whole and every part of the statute, together with other statutes standing in pari materia with it, as parts of a unified statutory system." (quotation omitted) (alterations omitted)). We also consider a statute's "purpose, effects and consequences" to aid in determining legislative intent. State v. Blake, 2017 VT 68, ¶ 9, 205 Vt. 265, 174 A.3d 126 (quotation omitted).

¶ 13. When it enacted Act 250 in 1970, the Legislature was concerned with "the unplanned, uncoordinated and uncontrolled use of the lands and the environment of the state," and sought to "protect and conserve the lands and the environment of the state to [ensure] that these

6

lands and environment are devoted to uses which are not detrimental to the public welfare and interests." 1969, No. 250 (Adj. Sess.), § 1. Accordingly, a person may not "commence construction on a . . . development, or commence development without a permit." 10 V.S.A. § 6081(a). Before a permit can be granted, the district commission must find that the development complies with several criteria codified in 10 V.S.A. § 6086(a)(1)-(10). These include examination of a development's effect on the environment, aesthetics, historic sites, means of transportation, local education and other government services, and conformance with local and regional development plans. See id.

¶ 14. The Legislature defined "development" according to several conditions, including the activity to be pursued and the municipality in which it will be located. Thus, in a municipality that has adopted permanent zoning and subdivision bylaws, so-called "ten-acre towns," development means "[t]he construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land, for commercial or industrial purposes." Id. § 6001(3)(A)(i).[3] In contrast, the Legislature defined development in a municipality that has not adopted permanent

---

[3] The Natural Resources Board has defined "involved land" in relevant part as:

> The entire tract or tracts of land, within a radius of five miles, upon which the construction of improvements for commercial or industrial purposes will occur, and any other tract, within a radius of five miles, to be used as part of the project or where there is a relationship to the tract or tracts upon which the construction of improvements will occur such that there is a demonstrable likelihood that the impact on the values sought to be protected by Act 250 will be substantially affected by reason of that relationship.

Act 250 Rules, Rule 2(C)(5)(a), Code of Vt. Rules 12 004 060 [hereinafter NRB Rules], https://nrb.vermont.gov/sites/nrb/files/documents/2015%20Adopted%20Rules.pdf [https://perma.cc/H9N4-99EG].

7

zoning and subdivision bylaws, "one-acre towns," as "[t]he construction of improvements for commercial or industrial purposes on more than one acre of land." Id. § 6001(3)(A)(ii).

¶ 15.    Despite their absence from the one-acre provision, neighbors urge us to read the terms "owned or controlled by a person" and "involved land" into the statute, warning that failure to do so would allow developers in one-acre towns to avoid Act 250 by constructing improvements on successively subdivided one-acre parcels like postage stamps on an envelope.  Neighbors, following the district commissioner before them, point to Vitale as an example of the problem.

¶ 16.    In Vitale, a developer entered into an agreement to buy 1.57 acres of land in Rutland Town, then a one-acre town, to operate a concrete step manufacturing business.  Before closing, the 1.57 acres were subdivided into two lots, one 0.99 of an acre and the other 0.58.  The closing took place with a transfer of the full purchase price, but the developer only accepted the deed of the 0.99-acre parcel, leaving the other in the seller's possession.  After the developer finished construction of improvements on the 0.99-acre parcel, the developer accepted the deed to the 0.58-acre parcel.

¶ 17.    The Environmental Board concluded that the project required an Act 250 permit based on the Board's then-existing regulation, which itself defined "development" in addition to the statute.  See Vitale, 151 Vt. at 582, 563 A.2d at 615.[4]  That Board rule defined development as:

> The construction of the improvements for any commercial or industrial purpose, including commercial dwellings, which is located on a tract or tracts of land of more than one acre owned or controlled by a person . . . . In determining the amount of land, the area of the entire tract or tracts of involved land owned or controlled by a person will be used.

---

[4]   The Environmental Board has been eliminated and replaced with the Environmental Division of the Superior Court, which now has jurisdiction over appeals concerning Act 250. N.E. Materials Grp., 2019 VT 55, ¶ 1 n.1.

Id. at 582 n.3, 563 A.2d at 615 n.3 (alteration omitted). Applying this definition, the Board concluded that the developer exercised "control" over the entire 1.57 acres at the time the project was built due to the characteristics of the two parcels and the nature of the sales transaction, which the Board determined was not made at arm's length. This Court deferred to the agency's interpretation of its rule, which was not itself challenged, and held that the agency's findings were not clearly erroneous. Id. at 585, 563 A.2d at 616.

¶ 18. The present controversy presents us with a different issue. The cited Board rule defining development in addition to the statute has been abrogated. The current rule merely defines development with a cross-reference to 10 V.S.A. § 6001(3)(A), see NRB Rule 2(A), supra, note 3, bringing us right back to the Legislature's "construction of improvements for commercial or industrial purposes on more than one acre of land," 10 V.S.A. § 6001(3)(A)(ii). Accordingly, Vitale does not control the question of statutory interpretation before us. However, we take into consideration the possibility of crafty transactions to avoid Act 250 in our reading of the statute.[5]

¶ 19. With these observations in mind, we turn to construe § 6001(3)(A)(ii) ourselves. We are guided by the plain language of the statute, the purposes of Act 250, and the anomalous consequences of alternative readings.

¶ 20. The parties do not dispute the meaning of "construction of improvements" or of "commercial or industrial purposes." Id. § 6001(3)(A)(ii). Our task is therefore to discern what the Legislature intended by "on more than one acre of land." Id. We find the language unambiguous, at least as it applies to the facts presented in this case. "The construction of improvements for commercial or industrial purposes on more than one acre of land" refers to the land actually used for the construction of improvements, rather than the size of the parcel on which

---

[5] Neighbors also rely on In re Audet, where we similarly reviewed an Environmental Board decision based on the abrogated rule. 2004 VT 30, ¶ 6, 176 Vt. 617, 850 A.2d 1000 (mem.). Given the abrogation, Audet is also inapposite.

the construction of improvements will be located. Id. Thus, if the construction of improvements will take place on one acre or less, then the activity does not constitute development, regardless of the size of the parcel on which it will be situated. If the Legislature had intended the Act 250 jurisdictional threshold in one-acre towns to turn, not on the land actually used for improvements, but on the land area of the parcel on which those improvements will be located, it would have used clear language to that effect.

¶ 21. Moreover, we cannot, under the facts of this case, simply read additional terms into the one-acre provision that the Legislature so conspicuously included in its neighbor. That may be appropriate when failing to do so would lead to absurd results or otherwise thwart the Legislature's intent. See, e.g., Judicial Watch, Inc. v. State, 2005 VT 108, ¶ 16, 179 Vt. 214, 892 A.2d 191 (explaining that absurd-results doctrine "permits an otherwise reasonable construction when a plain reading of the statute would produce a result demonstrably at odds with any conceivable legislative purpose" (quotation omitted)). For the reasons that follow, there is no such danger here. Accordingly, we "presume that all language in a statute was drafted advisedly, and that the plain ordinary meaning of the language used was intended." Comm. to Save the Bishop's House, Inc. v. Med. Ctr. Hosp. of Vt., Inc., 137 Vt. 142, 153, 400 A.2d 1015, 1021 (1979) (citations omitted).[6]

¶ 22. We have already recognized a distinction between the one-acre and ten-acre provisions in Committee to Save the Bishop's House. There, in construing the term "involved

---

[6] In their reply brief, neighbors argue that Snowstone and landowners did not preserve an argument that "involved land" and "owned or controlled by a person" do not apply in one-acre towns. But in so arguing, Snowstone and landowners are merely responding to neighbors' argument that those terms are part of the statute. There is no preservation issue. See In re Snyder Grp., Inc., 2020 VT 15, ¶ 7, __ Vt. __, 233 A.3d 1077 (explaining that "any named party, without filing a separate or cross-appeal, may make or renew in the appellate court any available argument designed to preserve or justify that portion of the judgment favorable to that party" (quotation omitted)). Accordingly, Snowstone and landowners' motion to file a sur-reply brief to address preservation is moot.

land" used in the ten-acre provision, we observed that there was no basis to restrict "involved land" "to the acreage actually used in the construction of improvements" because such an interpretation would ignore the distinction between construction " '[o]n more than one acre of land within a municipality which has not adopted permanent zoning and subdivision bylaws,' and construction '[i]nvolving more than 10 acres of land within a radius of five miles of any point on any involved land.' " Id. at 152, 400 A.2d at 1021 (quoting an earlier version of 10 V.S.A. § 6001(3)(A)(i)-(ii)). We further identified the reason behind the difference in language. In municipalities that adopt zoning and subdivision bylaws, the Act seeks "to mandate a second layer of review of proposed land use decisions, imposing substantial additional administrative and financial burdens on an applicant, and possibly interfering to some extent with local control of land use decisions, only where values of state concern are implicated through large-scale changes in land utilization." Id. at 151, 400 A.2d at 1020. It is reasonable to conclude that in municipalities that do not regulate land use, the Act's jurisdictional threshold is set at more than one acre of land used for improvements, and that, by implication, Act 250 leaves one acre or less of improvements unregulated.

¶ 23. It is apparent, both from the Legislature's own statement of purpose and from the Act's operative provisions, that Act 250 is concerned with land use and the effects such uses will have on the environment and the other enumerated criteria. The Act does not seek to subject every decision regarding land to government scrutiny or impose restrictions on the alienation of land for their own sake. Thus, if a Vermonter owns 1000 acres of pristine forest in a one-acre town with no improvements whatsoever and she wants to construct improvements for commercial or industrial purposes on one of those acres, it would be anomalous under the language of § 6001(3)(A)(ii) to expose her to the burdensome and costly requirements of the Act. It would be equally troubling for the permitting requirement to turn on a government actor's assessment of how such a landowner structures a legal market transaction to carry out the project. An alternative

11

reading of § 6001(3)(A)(ii) would always subject a landowner with a parcel larger than one acre in a one-acre town to Act 250 jurisdiction or to the government's scrutiny of her land use decisions, regardless of the land actually used for the construction of improvements. Every lemonade stand on a parcel larger than an acre could need an Act 250 permit.

¶ 24. Doubtless, in a future case, we will have to determine what the Act demands when a person seeks to construct improvements on successively subdivided one-acre plots of land as neighbors fear. It may be that such a scheme would then be considered "[t]he construction of improvements for commercial or industrial purposes on more than one acre of land." 10 V.S.A. § 6001(3)(A)(ii). It may be that "involved land," "owned or controlled by a person," or some other concept would then have to be read into the one-acre provision to avoid an absurd result or the frustration of the Act's purposes. Id. § 6001(3)(A)(i). But the facts of this case do not present an opportunity to answer that question.

¶ 25. Here, the Environmental Division found, based on the evidence introduced at the merits hearing, that the construction of improvements will be contained on 0.64 of an acre—or at most 0.93 of an acre if the access road is counted—and that there are no other commercial or industrial improvements on the remainder of landowners' property or in the vicinity. There is only one stamp on the envelope. The proposed project does not constitute development within the meaning of § 6001(3)(A)(ii) and accordingly does not require an Act 250 permit.

## II. Request for Additional Hearing

¶ 26. We next consider whether the Environmental Division erred in concluding that neighbors did not request an additional hearing in the JO appeal to present evidence regarding the project footprint in light of stormwater permit conditions. There was no error.

¶ 27. Under Vermont Rule of Environmental Court Proceedings 2(b), "where the same violation or project involves multiple proceedings that have resulted or may result in separate hearings or appeals in the Environmental Court, or where different violations or projects involve

significant common issues of law or fact," the Environmental Division may coordinate the proceedings and "make other orders that will promote expeditious and fair proceedings and avoid unnecessary costs or delay." The court enjoys discretionary authority to control its docket to preserve judicial resources and ensure efficient disposition of cases. See, e.g., In re Woodstock Cmty. Tr. & Hous. Vt. PRD, 2012 VT 87, ¶ 36, 192 Vt. 474, 60 A.3d 686 (observing that "every court has the power to control the disposition of the causes on its docket") (quotation omitted); State v. Jones, 157 Vt. 553, 559, 601 A.2d 502, 505 (1991) (leaving control of docket management with courts).

¶ 28. At the merits hearing, neighbors agreed to bifurcate the matter for the court to resolve the "involved land" and "owned or controlled by a person" issues based on the evidence presented at the merits hearing and then resolve the stormwater and project-footprint issues separately, with neighbors reserving the opportunity to "request that the record be reopened." In a later order memorializing the agreement, the court directed Snowstone to obtain the necessary stormwater permits and inform the court and neighbors of the permit determination within ten days of that determination. That order also gave the parties thirty days from the permit determination to request a further hearing in the JO appeal and warned that if no party requested such a hearing, the court would issue a final judgment.

¶ 29. Neighbors do not dispute that they did not file any request with the court within thirty days of the permit decision. Instead, they argue that the motion to consolidate the JO and MSGP appeals qualifies as a request for a further hearing in the JO appeal. But even if we were to consider the motion to consolidate as a motion to reopen the JO appeal, that motion was filed well beyond the thirty-day deadline the court imposed—forty-four days after the permit decision, to be exact. Nor can we agree with neighbors that Snowstone's failure to inform them and the court of the permit decision within 10 days excuses their own failure to abide by the court's order. Neighbors, who participated in the stormwater permitting proceedings, had notice that the permit

13

was issued at least by July 5, 2019, when they appealed the MSGP permit decision.  Still, they did not meet the court's July 12 deadline.  We cannot fault the court for enforcing its own rules in the face of this default.

### III.  Landowners' Intervention

¶ 30.   We affirm the Environmental Division's judgment concluding that the proposed project does not require an Act 250 permit, and the court's action in entering that judgment following neighbors' failure to abide by its order.  This disposition renders moot neighbors' argument that the court erred in allowing landowners to intervene, as any pronouncement on the subject will have no effect.  See Houston v. Town of Waitsfield, 2007 VT 135, ¶ 5, 183 Vt. 543, 944 A.2d 260 (mem.) (noting that issues become moot if Court can "no longer grant effective relief" (quotation omitted)).

Affirmed.

FOR THE COURT:

_____

Associate Justice

14