NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 34

No. 22-AP-296

In re DJK, LLC WW & WS Permit
(Ralph Crowley and Joanne Crowley, Appellants)

Supreme Court

On Appeal from
Superior Court,
Environmental Division

June Term, 2023

Thomas G. Walsh, J.

Jeremy S. Grant, Gary L. Franklin, and Jon Anderson of Primmer Piper Eggleston & Cramer, PC, Burlington, for Appellants.

Justin A. Brown, Nathan H. Stearns, and Matthew J. Greer of Sheehey Furlong & Behm P.C., Burlington, for Appellee DJK, LLC.

Charity R. Clark, Attorney General, and Melanie Kehne, Assistant Attorney General, Montpelier, for Appellee State of Vermont, Agency of Natural Resources.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **CARROLL, J.** Neighbors Ralph and Joanne Crowley appeal from the Environmental Division's summary judgment decision in favor of applicant DJK, LLC. We affirm.

## I. Procedural History

### A. Background

¶ 2. The following facts are undisputed. DJK owns real property in Manchester, Vermont. In March 2021, it sought a Wastewater System and Potable Water Supply Permit from the Department of Environmental Conservation (DEC). DJK proposed to construct a wastewater

system to serve an additional bedroom in an existing residence and a single bedroom in a detached accessory unit.

¶ 3. The Wastewater and Potable Water Supply Rules require that wastewater systems and potable water supplies, such as a well, be located a sufficient distance apart to protect public health and prevent groundwater contamination. See generally 10 V.S.A. §§ 1390(4), (5) (declaring as State policy "that the groundwater resources of the State are held in trust for the public" and that State's "groundwater resources . . . shall be managed to minimize the risks of groundwater quality deterioration by regulating human activities that present risks to the use of groundwater in the vicinities of such activities"). To this end, the rules create a "presumptive isolation zone" around potable water supplies and septic systems. A "Wastewater System Presumptive Isolation Zone" is defined as "an area delineated around leachfields, replacement areas, and wastewater tanks in which a potable water source with a design rate of less than or equal to 2.0 gallons per minute, assuming it would be located in bedrock or confined surficial aquifer, is presumed to be unable to be located." Wastewater System and Potable Water Supply Rule § 1-201(103), Code of Vt. Rules 12 033 001 [hereinafter Rule 0.001], http://www.lexisnexis.com/hottopics/codeofvtrules (providing that presumptive isolation zone "takes the size and shape identified in § 1-913(a)").

¶ 4. To qualify for a wastewater permit, an applicant must demonstrate, among other things, that the proposed location of its wastewater system does not contain any potable water supplies within its associated isolation zone. See Rule 0.001 §§ 1-301, 305. The rules contain an essentially reciprocal isolation zone for the construction of a potable water supply. Rule 0.001 § 1-1105(a) ("A presumptive isolation zone shall be identified, using the methods identified in § 1-912, around proposed potable water sources in which a leachfield with a design flow of less than 2000 gallons per day is presumed to be unable to be located."). The rules allow isolation distances to be reduced under certain circumstances. See Rule 0.001 § 1-912(e) (wastewater) ("An applicant or prospective applicant may submit a written request to the Secretary for a reduction in the

2

required isolation distances or isolation zone for a particular feature of object."); Rule 0.001 § 1-1104(k) (similar provision concerning potable water supplies).

¶ 5.     Under the "first in time" approach used in Vermont and most New England states, a wastewater or potable water supply permit "is issued to the person who first applies for a permit, even if the required isolation distances extend onto property not owned by the applicant."  See "A Review of the 'Overshadowing' of Water Supply-Wastewater System Isolation Distances," Report of the Technical Advisory Committee to the Vermont Legislature, at 1, 47-50, App. 8.4 (Jan. 15, 2010) [hereinafter TAC Report] (recognizing that Vermont, like most New England states, uses first-in-time approach to wastewater system and potable water supply permitting when first permit approves isolation zone overshadowing one or more neighboring properties), https://dec.vermont.gov/sites/dec/files/dwgwp/rotac/pdf/2011.01.15.tacovershadowingrep.pdf [https://perma.cc/5EFQ-4XBE].   This "approach has been used since the Agency of Natural Resources began issuing permits for water and wastewater systems starting in 1969."  Id. at 1.  At the request of the Legislature, the Technical Advisory Committee "examined alternative approaches," and "[a]fter considering the effect of these approaches," it "strongly recommend[ed] retaining the first-in-time approach."  Id.

¶ 6.     In this case, the presumptive isolation zone for DJK's proposed wastewater system "overshadowed" neighboring property, including land owned by the Crowleys.  The presumptive isolation zone covered approximately ten percent of the Crowleys' lot.  It was undisputed that the overshadowed portion of the Crowleys' lot is currently undeveloped and does not contain a potable water supply.  The Crowleys have an existing well/potable water supply, wastewater system, and residence outside of the presumptive isolation zone.  They have no plans to install a potable water supply in this area; they did not apply for a permit or analyze if a reduction in the isolation zone could be obtained.

¶ 7.     Because the presumptive isolation zone overshadowed the Crowleys' property, DJK provided the Crowleys notice of the permit application by certified mail.  See 10 V.S.A.

3

§ 1973(j)(1) (requiring applicant seeking potable water supply or wastewater permit to "send by certified mail, on a form provided by the Secretary [of ANR], a notice of an intent to file a permit application, including the site plan that accurately depicts all isolation distances, to any landowner affected by the proposed isolation distances at least seven calendar days prior to the date that the permit application is submitted to the Secretary"). The notice informed the Crowleys that they had the opportunity to discuss and potentially resolve conflicts before a permit was issued. It included a site plan depicting the proposed wastewater system with "presumptive isolation zones drawn around the proposed . . . septic system." The notice also stated, as required by DEC, that the Crowleys could "construct houses, garages, and driveways within the presumptive isolation zone" and that "[n]either the legislature nor the Rules authorize or require the [DEC] to deny a permit application when presumptive isolation zones extend onto [neighboring] property."

¶ 8. The Crowleys' contractor asked DJK to alter the system design to remove the presumptive isolation zone from their property. The contractor presented potential design alternatives to the Crowleys but they did not respond.

¶ 9. In April 2021, the DEC granted a wastewater system and potable water supply permit to DJK. The permit includes a condition requiring adherence to the isolation distances set forth in the rules. See Rule 0.001 § 1-309(a) ("The Secretary may include any condition in a permit that he or she deems necessary to protect human health and the environment or to otherwise satisfy the purposes and requirements of these Rules, including requirements addressing operation and maintenance of a wastewater system or potable water supply."). Specifically, paragraph 2.3 of DJK's permit provides:

> No buildings, roads, water pipes, sewer services, earthwork, regrading, excavation, or other construction that might interfere with the operation of a wastewater system or a potable water supply are allowed on or near the site-specific wastewater system, wastewater replacement area, or potable water supply depicted on the stamped plans. Adherence to all isolation distances that are set forth in the Wastewater and Potable Water Supply Rules is required.

4

¶ 10. The Crowleys appealed the permit to the Environmental Division, which considered the matter de novo. The Crowleys argued that the permit was invalid because the State took their property via the presumptive isolation zone and they were denied an opportunity to be heard before the permit's issuance. The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Vermont Constitution similarly provides that "whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money." Vt. Const. ch. I, art. 2. "[V]irtually the same test" applies under both constitutions. Ondovchik Family P'ship v. Agency of Transp., 2010 VT 35, ¶ 14, 187 Vt. 556, 996 A.2d 1179.

¶ 11. More specifically, in their third amended statement of questions, the Crowleys asked in relevant part if the permit language cited above:

> state[s] a condition that is invalid because it seeks to impose an illegal easement on Crowley in violation of constitutional standards articulated by the Environmental Division in In re Umpire Mtn., LLC, WW and WS Permit Docket No. 171-12-12 Vtec (February 2014), as well as Dolan v. City of Tigard, 512 US 374 (1994), and Nollan v. Calif Coastal Commission, 483 US 825 (1987).

¶ 12. Neighbors' substantive argument evolved over the course of the case. It shifted from an argument that a "land-use extraction" occurred under the Dolan/Nollan line of takings cases to an argument that the permit effectuated a "permanent physical invasion" of their property as in Cedar Point Nursery v. Hassid, 594 U.S. 139 (2021).

¶ 13. DJK moved for summary judgment and alternatively, dismissal of the Crowleys' appeal. The Crowleys opposed the motion and moved for summary judgment in their favor. The Agency of Natural Resources opposed the Crowleys' summary-judgment motion as did DJK.

## B. Trial Court Decision

¶ 14. The court concluded that DJK was entitled to summary judgment on the questions raised by the Crowleys in their appeal. At the outset, the court found that its jurisdiction to consider "property-related issues and rights [was] limited to issues within the scope of the regulations

governing the permit application." In re Britting Wastewater/Water Supply Permit, No. 259-11-07 Vtec, slip op. at 4 (Vt. Envtl. Ct. Apr. 7, 2008) [https://perma.cc/46RJ-FRFU]. The Britting court considered an argument similar to that raised by neighbors here, i.e., whether a wastewater and potable water supply permit that "allows a well isolation zone to extend beyond the Britting property onto [the] [a]ppellant's property" unfairly restricted "the potential use of a portion of [the] [a]ppellant's property." Id. at 1. The Britting court held that it lacked jurisdiction to address arguments "about the extent and nature" of the parties' respective "property interests in regard to unauthorized use or trespass, easements, or alienability." Id. at 4. It added that the neighbors' questions were "also posed as purely advisory questions," which were beyond its "authority to address." Id.

¶ 15. The court in this case similarly held that it lacked jurisdiction to determine the parties' private property rights. Thus, to the extent that the Crowleys asked if the permit's isolation distances appropriated a permanent "easement-like" interest in their real property rights, the court found that this required a determination of property rights that was beyond its jurisdiction. The court stated that it consequently could not determine if, on this basis, a per se physical taking of a legal interest in neighbors' property occurred. To the extent DJK sought summary judgment based on the court's lack of jurisdiction to adjudicate private property rights, the court granted DJK's request without reaching the merits of whether a taking occurred.

¶ 16. The court did consider if "the Rules, as applied to [neighbors] by way of the Permit, amount[ed] to a taking due to the State's placement of potential development limitations on their propert[y]." The court discussed takings jurisprudence generally. As indicated above, the Takings Clause of the Fifth Amendment requires that "private property . . . not be taken for public use, without just compensation." It "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005) (quotation omitted). "In other words, it is designed not to limit the governmental

6

interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." Id. at 536-37 (quotation omitted).

¶ 17. The court explained that when the government imposes regulations that restrict an owner's ability to use his own property, a balancing test applies to determine if the use-restriction amounts to a taking. See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 322-23 (2002) (recognizing "longstanding distinction between acquisitions of property for public use . . . and regulations prohibiting private uses," the latter of which "necessarily entails complex factual assessments of the purposes and economic effects of government actions" (quotation omitted)). "To determine whether a use restriction effects a taking, th[e] Court has generally applied the flexible test developed in Penn Central [Transp. Co. v. New York City, 438 U.S. 104, 124 (1978)], balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." Cedar Point Nursery, 549 U.S. at 148.

¶ 18. The court recognized that regulatory takings can go "too far," however, and rise to the level of a per se taking, without the need for a balancing test. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014 (1992). Case law has extended the per se takings rule to regulations that either (1) deprive the owner of "all economically beneficial or productive use" of their property, see id.at 1015; or (2) authorize a physical invasion of their property, see, e.g., Cedar Point Nursery, 594 U.S. at 156-57; Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982). See also Lucas, 505 U.S. at 1015 (recognizing "at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint": (1) "regulations that compel the property owner to suffer a physical "invasion" of his property"; and (2) regulations that deny "all economically beneficial or productive use of land").

¶ 19. The Crowleys conceded below that the permit's presumptive isolation zone did not cause a Penn Central regulatory taking or a Nollan/Dolan land-use exaction. See generally Penn

7

Central, 438 U.S. at 130 (rejecting as untenable argument that party "may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development," and rejecting "related contention that a 'taking' must be found to have occurred whenever the land-use restriction may be characterized as imposing a 'servitude' on the claimant's parcel"). Neighbors' sole takings assertion before the Environmental Division was that the permit and its accompanying regulations caused a per se physical taking pursuant to Cedar Point Nursery, 594 U.S. 139.

¶ 20.   In Cedar Point Nursery, the Supreme Court considered a regulation that "granted labor organizations a 'right to take access' to an agricultural employers' property in order to solicit support for unionization." Id. at 143 (citation omitted). The Court was asked to decide if the regulation effected an unconstitutional per se physical taking under the federal Constitution by appropriating without compensation an easement for union organizers to enter the employers' property. In conducting its analysis, the Court explained that:

> Our cases have often described use restrictions that go too far as regulatory takings. But that label can mislead. Government action that <u>physically appropriates property</u> is no less a physical taking because it arises from a regulation. That explains why we held that an administrative reserve requirement compelling raisin growers to physically set aside a percentage of their crop for the government constituted a physical rather than a regulatory taking. The essential question is not . . . whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree). It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property. Whenever a regulation results in a physical appropriation of property, a per se taking has occurred, and [the balancing test called for in] <u>Penn Central</u> has no place.

594 U.S. at 149 (emphasis added).

¶ 21.   The <u>Cedar Point</u> Court concluded that the regulation in question effected a physical taking: it gave union organizers "the right to physically enter and occupy the growers' land for three hours per day, 120 days per year," and "[r]ather than restraining the growers' use of their own property, the regulation appropriate[d] for the enjoyment of third parties the owners' right to

8

exclude." Id. The Court considered "the right to exclude" "one of the most treasured rights of property ownership" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property." Id. at 149-50 (quotation omitted). It thus concluded that the employers had "state[d] a claim for an uncompensated taking in violation of the Fifth and Fourteenth Amendments" of the federal constitution. Id. at 152 (citation omitted).

¶ 22. The Environmental Division distinguished the facts of Cedar Point Nursery from the instant case. It found that the presumptive isolation zone was not a physical invasion of neighbors' property as in Cedar Point Nursery and therefore, it did not constitute a per se physical taking as a matter of law. Unlike Cedar Point Nursery, the court concluded, the Wastewater System and Potable Water Supply rules did not authorize any physical entry or occupation of neighbors' property. Instead, the presumptive isolation zone delineated an area in which a use-restriction regulated where a landowner might be able to site a well. The court concluded that, categorically, this was not the type of physical occupation, entry, or invasion, that constituted a per se physical taking as a matter of law. The court further determined, as a matter of law, that there was no absolute private property interest in groundwater and that the presumptive isolation zone would not prohibit or interfere with neighbors' access to groundwater in a way that could deprive them of all economic use of their property.

¶ 23. The court also rejected the Crowleys' procedural due process claim. It found that the Crowleys failed to show that they were deprived of any property, and they thus could not establish a violation of their procedural due process rights as a matter of law. See Conway v. Gorczyk, 171 Vt. 374, 376, 765 A.2d 463, 465 (2000) (recognizing that existence of "a liberty or property interest which has been interfered with by the State" is necessary to give rise to procedural due process claim). Even if the permit did implicate a property interest, the court continued, neighbors were provided notice and an opportunity to be heard. They received notice of applicant's intent to file a permit application, they attempted to resolve their objections with applicant, and neighbors then pursued an appeal to the Environmental Division, challenging the

9

permit. The court found no evidence to show that neighbors were prejudiced by their inability to challenge the permit prior to their appeal to the Environmental Division. The court thus rejected this claim of error. The court did not reach neighbors' remaining questions, which were premised on arguments that the court had rejected. This appeal followed.

## II. Arguments on Appeal

### A. Per Se Physical Taking

¶ 24. Neighbors first argue that the court had jurisdiction to determine if applicant's permit sought "to impose an illegal easement on [them]" or otherwise appropriate a property interest from them. Neighbors maintain that this claim involves the legality of permit conditions, and thus arises under 10 V.S.A. chapter 220. See 4 V.S.A. § 34(1) (providing that "[t]he Environmental Division shall have . . . jurisdiction of matters arising under 10 V.S.A. chapters 201 and 220"). Neighbors contend that the court misconstrued Britting, and they cite Ondovichik Family Ltd. P'ship, 2010 VT 35, ¶ 20, Nordlund v. Van Nostrand, 2011 VT 79, ¶ 13, 190 Vt. 188, 27 A.3d 340, and several other cases in support of their position. According to neighbors, the court "has jurisdiction to determine whether the [p]ermit appropriated a property right from [them], even if it lacks jurisdiction to determine the scope of such property right."[1]

¶ 25. We review the Environmental Division's legal conclusions de novo, In re Diverging Diamond Interchange Act 250, 2020 VT 98, ¶ 18, 213 Vt. 480, 247 A.3d 499, and we find no error. The Environmental Division is a court of limited jurisdiction. Its subject-matter jurisdiction is limited to areas authorized by 4 V.S.A. § 34, which includes jurisdiction over environmental appeals arising under 10 V.S.A., Chapter 220. Pursuant to Chapter 220, the

---

[1] We note that the Crowleys argued below that the Environmental Division did not need to "determine whether paragraph 2.3 of the Permit creates or establishes an easement burdening [their] Property," or "even determine whether the Permit imposes an easement, a covenant, a servitude or any other specific legal interest in real property." They asserted that the court needed only decide "a single, narrow property-related issue—whether DJK's Permit affects any interest in Crowley's Property—which is an issue within the scope of the regulations governing DJK's Permit application and an issue well-within this Court's jurisdiction."

Environmental Division considers permit appeals de novo, "applying the substantive standards" that applied at the agency level. 10 V.S.A. § 8504(h). The fact that the Environmental Division has authority to consider permit appeals does not authorize it to adjudicate private property disputes, such as the existence of easements. The civil division, not the Environmental Division, has jurisdiction over such matters. See 4 V.S.A. § 31. As discussed in greater detail below, the Environmental Division considered neighbors' challenge to the permit in a way that was consistent with its limited jurisdiction.

¶ 26.    The Environmental Division has long recognized that it lacks jurisdiction to adjudicate private property rights, including "determin[ing] the scope or validity of easements, rights-of-way, or restrictive covenants." Capitol Plaza Act 250, No. 59-5-19, slip. op. at 6 (Vt. Envt'l Ct. Aug. 1, 2019), [https://perma.cc/8T9W-U3T2 ]. The court did not misconstrue Britting in so concluding. This Court has also recognized this limitation on the Environmental Division's jurisdiction. See In re Woodstock Cmty. Tr. & Hous. Vt. PRD, 2012 VT 87, ¶¶ 40-41, 192 Vt. 474, 60 A.3d 686 (recognizing, as agreed by parties, that "the Environmental Division does not have jurisdiction to determine private property rights" (citing Nordlund, 2011 VT 79, ¶ 17). Indeed, neighbors here also agree that the Environmental Division lacks "jurisdiction to adjudicate ownership interests when ownership is disputed." Whether the requirements for an easement are satisfied is the type of private-property dispute that the Environmental Division lacks jurisdiction to resolve.

¶ 27.    The cases cited by neighbors do not persuade us otherwise. Neighbors do not explain how Ondovichik supports their position, and they have misquoted the language on which they rely. In Ondovichik, we considered a landowner's inverse condemnation claim against the State. The landowner argued there that, by snowplowing the highway adjacent to its building, the State "ha[d] physically taken those parts of the property hit by snow throw and water runoff," including its building, and "that [the] landowner [was] therefore owed compensation." 2010 VT 35, ¶ 1.

11

¶ 28.   We rejected this argument.  In conducting our analysis, we stated that:

> The analysis of whether governmental action effects a taking looks only at whether a property interest has been taken and does not take into account the type of property affected.  If a taking is found, then the type of property taken is, of course, relevant to determining the proper amount of compensation.   But the type of property is irrelevant to the initial step of determining whether a taking has actually occurred. See, e.g., Loretto, 458 U.S. at 439 ("We fail to see . . . why a physical occupation of one type of property but not another type is any less a physical occupation.").  Thus, an alleged taking of a building is evaluated the same way as an alleged taking of any other type of property, and landowner therefore has no greater claim to a taking than would any landowner whose property abuts a public highway.

Id. ¶ 20.

¶ 29.   It does not follow from this statement that the Environmental Division has authority to decide private property disputes.  We simply observed that a landowner's building could be "taken" just like real property.  Indeed, we noted in Ondovichik that if an "intrusion is 'limited and transient' in nature and occurs for legitimate governmental reasons, it does not amount to a taking." Id. (citing Boise Cascade Corp. v. United States, 296 F.3d 1339, 1357 (Fed. Cir. 2002) (denying takings claim when governmental officials intermittently walked on landowner's property to conduct owl surveys); accord Krier v. Dell Rapids Twp., 2006 SD 10, ¶ 28, 709 N.W.2d 841 (upholding denial of takings claim when property invaded by dust and gravel from resurfacing of nearby road); but see Cedar Point Nursery, 594 U.S. at 153 (recognizing that "a physical appropriation is a taking whether it is permanent or temporary," and "[t]he duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation" (citation omitted) (emphasis added)).  Ondovichik does not assist neighbors here.

¶ 30.   Neighbors also misstate the holding of Norlund.  We did not in that case "confirm[] that the [Environmental Division] can determine the existence of an easement or right-of-way, but cannot evaluate its scope," as neighbors' assert.  That case involved "a private zoning enforcement action" under 24 V.S.A. § 4470(b).  Nordlund, 2011 VT 79, ¶ 10.  Section 4470(b) authorizes municipalities, the superior court, and the Environmental Division to enforce municipal panel

12

decisions via "mandamus, injunction, process of contempt, or otherwise." Id. In a prior action, the superior court had determined that a right-of-way existed over the plaintiff's property to the defendants' landlocked property, although the width of this right-of-way was insufficient under town zoning regulations to allow for a development permit for the back lot. See id. ¶ 3; see also Nordlund v. Van Nostrand, No. 2007-027, 2007 WL 5313317 (Vt. Aug. 1, 2007) (unpub. mem.). The defendants ultimately obtained a different right-of-way across neighboring property, which enabled them to build a home on the back lot. They also continued to use the right-of-way across the plaintiff's property.

¶ 31. The plaintiff later sought an injunction in the Environmental Court to prevent defendants from continuing to use the right-of-way across her property. The plaintiff "[did] not contest the validity" of the right-of-way, but instead argued that the defendants could not use it because its width did not satisfy zoning requirements and "no permit for development could be based upon it." Nordlund, 2011 VT 79, ¶ 12. The Environmental Court held that it lacked subject-matter jurisdiction over the matter because the plaintiff was not seeking to enforce any municipal decision. We upheld its decision. The Environmental Court did not in that case resolve disputed private property rights.

¶ 32. Neighbors' reliance on 34 Fitzsimonds Rd. 3-Lot Subdivision, No. 68-6-18 Vtec (Vt. Env't Ct. Apr. 25, 2019) [https://perma.cc/E9J6-FN8V], is equally misplaced. In that case, the applicants sought to subdivide their property and the town approved their application on the condition that the applicants provide the town "with a fifteen-foot-wide, 2,000-foot-long easement along two sides of their property to serve as a recreational path for the public." Id. at *1. The applicants argued that this condition constituted a taking by the town. The Environmental Division rejected this argument, considering case law relevant to the circumstances under which "a municipality can condition approval of a permit on the dedication of property to the public without incurring a taking." Id. at *9. Applying the relevant test, the court concluded that there was "an 'essential nexus' between the condition and the legitimate government interest it further[ed]," id.

13

(quoting Nollan, 483 U.S. at 837), and that there was "a 'rough proportionality' between the nature and extent of the condition and the social costs of the proposed development," id. (quoting Dolan, 512 U.S. at 391).

¶ 33.  In a footnote, the court observed that it "ha[d] jurisdiction over unconstitutional takings claims arising in the context of a specific permit application on appeal." Id. at *7 n.6.  It emphasized, however, that its analysis "in this specific corner of takings jurisprudence—public dedications effected through municipal permit conditions—d[id] not have implications for the more common analysis Vermont courts apply when assessing whether government regulation amounts to a taking." Id. at *9 n.7 (citing Ondovchik, 2010 VT 35, ¶¶ 14-22 (evaluating more conventional takings claim under common analysis) and Lingle, 544 U.S. at 546-48 (distinguishing Nollan and Dolan takings test from traditional takings considerations).  The court in that case was not asked to determine the existence of an easement, as here.  There was no dispute over the existence of the easement required by the town as a condition of the subdivision permit.  The court's general statement about takings is consistent with the Britting court's statement regarding jurisdiction and with the court's approach here.  The court here considered if the rules, as applied to neighbors by way of the permit, amounted to a taking due to the State's placement of potential development limitations on their property, including whether there was a per se physical taking as in Cedar Point Nursery.

¶ 34.  Neighbors offer no persuasive authority in support of their assertion that the Environmental Division had jurisdiction to determine if the permit created an easement in their property and we reject their first claim of error.

¶ 35.  As referenced above, the Environmental Division did consider if the permit condition effected a taking under the analysis in Cedar Point Nursery, that is, whether the regulation authorized a physical invasion of their property.  This was consistent with its authority

14

to consider "property-related issues and rights . . . within the scope of the regulations governing the permit application." Britting, No. 259-11-07 Vtec, slip op. at 4.[2]

¶ 36.   The court found that the possible restriction on neighbors' free use of groundwater within the isolation zone could not be a constitutional taking because neighbors did not have an absolute private property interest in groundwater.   See 10 V.S.A. § 1410(a)(5) (abolishing "common-law doctrine of absolute ownership of groundwater").   It explained that the State's "groundwater resources" are "held in trust for the public," id. § 1390(5), and managed "for the benefit of all Vermonters," and "all persons have a right to the beneficial use and enjoyment of groundwater free from unreasonable interference by other persons."   Id. §§ 1390(2), 1410(a)(4). Because "groundwater in Vermont is not subject to private ownership," the court continued, it cannot be "taken" by the government.   The court further concluded, as a matter of law, that the presumptive isolation zone would not prohibit or interfere with neighbors' access to groundwater in a way that would deprive them of all economic use of their property.

¶ 37.   Neighbors fail to show that the court erred in finding the absence of any physical invasion here.   They claim to have been deprived of their "right to access and use groundwater beneath their land."   In support of this assertion, however, they rely on cases that either predate the statute that abolished the common-law right of absolute ownership of groundwater, or that have been declared as no longer good law.   See, e.g., Timms v. State, 139 Vt. 343, 428 A.2d 1125 (1981); Ondovchik Fam. Ltd. P'ship, 2010 VT 35, ¶ 15 (holding that "Timms is no longer good law").[3]   They do not show, moreover, that they have been deprived of the beneficial use of

---

[2]   The concurrence agrees that, notwithstanding the Environmental Division's statements about jurisdiction, it fully addressed neighbors' sole takings claim and that any error in its jurisdictional conclusions appears harmless. Post, ¶ 50, n.8.

[3]   As indicated above, the Legislature abolished the "common-law doctrine of absolute ownership of groundwater," and designated the State's "groundwater resources . . . as a public trust resource."   10 V.S.A. §§ 1410(a)(5), 1390(5).   It provided a statutory cause of action for "equitable relief or an action in tort to recover damages, or both, for the unreasonable harm caused by another person withdrawing, diverting, or altering the character or quality of groundwater," id. § 1410(c).   The Legislature made clear that "[t]he designation of the groundwater resources of the

groundwater on their property to the extent that they have such a right; their home is served by an existing well.[4]

¶ 38.    Further, unlike Cedar Point Nursery and the other cases cited by neighbors, the regulation here does not allow anyone or anything to physically enter neighbors' property.  See, e.g., U.S. v. Causby, 328 U.S. 256, 259, 265 (1946) (concluding that physical invasion existed where government aircraft regularly and frequently flew very low over owner's property, invading "superadjacent airspace" that belonged to owner, explaining that physical intrusion was "so close to the land that continuous invasions of it affect[ed] the use of the surface of the land itself," and "invasions of it [were] in the same category as invasions of the surface"); see also Cedar Point Nursery, 549 U.S. at 152 (reviewing per se physical-takings case law and explaining that "[t]he upshot of this line of precedent is that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation").  There has been no actual physical invasion of neighbors' property here, which is required under Cedar

---

State as a public trust resource shall not be construed to allow a new right of legal action by an individual other than the State of Vermont, except to remedy injury to a particularized interest related to water quantity protected under this subchapter." Id. § 1390(5).  Neighbors did not pursue a cause of action under § 1410, nor would the Environmental Division have jurisdiction to consider such claim.

[4]  The concurrence agrees that neighbors fail to establish a per se physical taking under Cedar Point Nursery, which is the sole takings claim pursued by neighbors in this case. Post, ¶ 43. There is no regulatory taking argument in this case; it was waived below.  The concurrence's discussion of usufructuary rights and suggestion of a standard for a regulatory takings test that differs from the test under the federal Constitution are unnecessary to resolve this case and are dicta.  These arguments were also not raised below or on appeal and should not be addressed here. See generally In re Sealed Documents, 172 Vt. 152, 156, 772 A.2d 518, 523 (2001) (noting this Court's "tradition of addressing issues of constitutional significance only when the matter is squarely and necessarily presented"); State v. Bauder, 2007 VT 16, ¶ 27, 181 Vt. 392, 924 A.2d 38 ("It is . . . a fundamental tenet of judicial restraint that courts will not address constitutional claims—least of all novel or unresolved constitutional claims—when adequate lesser grounds are available."); State v. Brillon, 2010 VT 25, ¶ 6, 187 Vt. 444, 995 A.2d 557 (recognizing that party must "diligently develop and plausibly maintain state constitutional issues," and "[m]erely citing the Vermont Constitution, without providing any analysis of how the state constitutional provision compares with its federal analog, does not adequately present the issue for our review, especially where the argument was not presented in the trial court" (quotation omitted)).

16

Point Nursery.[5]  To the extent that neighbors argue that an easement has been created, we do not address that argument for the reasons stated above.

¶ 39.  Having found no taking, we do not consider neighbors' argument that the presumptive isolation zones called for in the rules serves no valid public purpose.

### B.  Procedural Due Process

¶ 40.  Neighbors next argue that their procedural due process rights were violated.  They assert that they were entitled to "a meaningful opportunity to be heard" before the DEC issued the permit to applicant.  They again claim to have been deprived of "a legally protected property right to use and access the groundwater beneath their property."  Although the Environmental Division reviewed the matter de novo, neighbors contend that the court "did not remedy the procedural error in the permit process below, claiming it lacked subject matter jurisdiction to do so."  It is not clear what procedural error is being referenced.  Neighbors question if the issue can ever be reviewed if this Court does not consider in this appeal whether there was a per se physical taking of their property.

¶ 41.  The court did not err in rejecting neighbors' procedural due process claim.  We agree with the Environmental Division that neighbors fail to show that they were deprived of any cognizable property interest, and thus, they were not deprived of due process as a matter of law.  See Conway, 171 Vt. at 376, 765 A.2d at 465 (explaining that "[c]ourts examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient").

¶ 42.  Even if neighbors could show that they had a property interest implicated by the permit, moreover, they were provided with notice and a meaningful opportunity to be heard and

---

[5]  We do not address neighbors' one-sentence assertion about the possible migration of human waste onto their property.  Neighbors fail to show that they raised this argument below and, in any event, the assertion is speculative and inadequately briefed.

they fail to show that they were prejudiced by any inability to challenge the permit prior to the de novo consideration of their appeal in the Environmental Division and before this Court. See Brock v. Roadway Exp., Inc., 481 U.S. 252, 261 (1987) ("[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotation omitted)). As set forth above, the Environmental Division considered and rejected neighbors' assertion that a per se physical taking occurred consistent with its limited jurisdiction. Neighbors' disagreement with the Environmental Division's conclusions does not establish a violation of their procedural due process rights.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 43. **REIBER, C.J., concurring in the judgment.** I agree with the majority's conclusion that plaintiffs have not made a sufficient showing to establish a per se taking under Cedar Point Nursery. Because that is the sole takings claim raised by plaintiffs in the Environmental Division, that conclusion is dispositive.[6] I write separately to register my disagreement with two aspects of the majority's decision. First, I disagree that the court lacked jurisdiction to consider the existence of an easement as part of plaintiffs' per se physical takings claim. Second, I believe that the court and the majority erred in concluding that the Legislature's abolishment of absolute ownership in groundwater necessarily means that property owners have no rights to groundwater that are subject to a takings claim. Accordingly, I join the majority's opinion only as to the judgment.

---

[6] As the court below noted, in plaintiffs' motion for summary judgment, they disclaimed any other type of takings claim. In their principal brief, plaintiffs similarly state that "only one type of takings claim is at issue in this appeal—per se physical takings."

18

A.  The Environmental Division's Jurisdiction

¶ 44.    The majority first concludes that "[w]hether the requirements for an easement are satisfied is the type of private-property dispute that the Environmental Division lacks jurisdiction to resolve." Ante, ¶ 26.  I respectfully disagree.  Nothing in the statutory scheme or our precedents compels this conclusion.  As-applied constitutional challenges to wastewater permit conditions are squarely within the Environmental Division's jurisdiction; it makes no jurisdictional difference if embedded in the challenge is a required determination of the existence of an easement.

¶ 45.    Under 4 V.S.A. § 34(a), the Environmental Division has "jurisdiction of matters arising under 10 V.S.A. chapters 201 and 220."  Chapter 220 governs "all appeals of an act or decision of the Secretary" of Natural Resources under various authorities, including "chapter 64 (potable water supply and wastewater system permit)."  10 V.S.A. § 8503(a)(1)(K).  Chapter 64 conversely states that "[a]ppeals of any act or decision of the Department under this subchapter shall be made in accordance with chapter 220 of this title." Id. § 1977.  Chapter 64 establishes a "comprehensive program to regulate the construction . . . [of] wastewater systems in the State," id. § 1971(1), and requires the ANR to adopt rules about "isolation distances." Id. § 1978(a)(3).  Thus, an as-applied challenge to a permit condition regarding isolation distances arises under Chapter 64, and related appeals are governed by Chapter 220.  That places this claim directly within the jurisdiction of the Environmental Division under 4 V.S.A. § 34.  Nowhere in the statutory scheme does the Environmental Division's jurisdiction exclude determinations of private property rights where necessary to a claim that is otherwise within the court's jurisdiction.

¶ 46.    Nothing in our precedents changes this conclusion.  In Nordland v. Van Nostrand, we recognized that the Environmental Division lacked jurisdiction to decide a purely private property dispute because "there [was] no violation of an existing zoning decision," and therefore no jurisdiction under 24 V.S.A. § 4470(b).  2011 VT 79, ¶ 17, 190 Vt. 188, 27 A.3d 340.  But that case did not hold that an adjudication of private property rights that is otherwise within the court's jurisdiction is prohibited.  And in In re Woodstock Community Trust and Housing Vermont PRD,

19

while we noted that "[t]he parties agree that the Environmental Division does not have jurisdiction to determine private property rights," we did not hold this as a matter of law, nor did we suggest that this restriction would apply where jurisdiction was otherwise present. 2012 VT 87, ¶ 40, 192 Vt. 474, 60 A.3d 686.

¶ 47.    Absent any express limitation on jurisdiction in either the statute or our case law, the court below relied on Environmental Division precedent to support its conclusion. But the first case cited by the court, In re Britting Wastewater/Water Supply Permit, drew a jurisdictional distinction based not on whether the claims required a determination of property rights, but on whether the claims arose directly out of the permit. See No. 259-11-07 Vtec, slip op. at 4-5 (Vt. Env't Ct. Apr. 7, 2008) [https://perma.cc/46RJ-FRFU] (concluding that court had jurisdiction to "address the constitutionality of the 2005 ANR Rules as applied to the particular permit application on appeal," but not the auxiliary question of whether "an easement benefitting the Britting property is required to be acquired from Appellant before the permit could be approved"). The Environmental Division later drew this same distinction in 34 Fitzsimonds Road 3-Lot Subdivision, concluding that "[w]hile parties seeking to challenge a municipal ordinance on its face must bring an action in the Washington Superior Court, this court has jurisdiction over unconstitutional takings claims arising in the context of a specific permit application on appeal."[7] No. 68-6-18 Vtec, slip op. at 10 n.6 (Vt. Env't Ct. Apr. 25, 2019) [https://perma.cc/E9J6-FN8V].

¶ 48.    In contrast, in the second case cited below, In re Umpire Mountain, LLC WW & WS Permit, the Environmental Division did draw the same jurisdictional distinction as the court here, concluding that it lacked jurisdiction to determine "whether DEC has affected the real property rights of the parties in applying the isolation distances" and therefore could not decide

---

[7] The majority suggests that the court's jurisdictional conclusion in Fitzsimonds Road was limited to Nollan/Dolan style takings, ante, ¶ 33, because the court later noted that its analysis "does not have implications for the more common analysis Vermont courts apply when assessing whether government regulation amounts to a taking." No. 68-6-18 Vtec, at 13 n.7. But the passage quoted by the majority relates not to the court's jurisdictional conclusion, but to its later analysis of the merits of the takings claim.

whether the permit, as applied, created a "per se taking of an easement on Appellants' property." No. 171-12-12 Vtec, slip op. at 8 (Vt. Env't Ct. Feb. 27, 2014) (quotation marks omitted) [https://perma.cc/L8DT-9JZE]. In reaching this conclusion, the court cited only <u>Britting</u>. See <u>id</u>. But as discussed, <u>Britting</u> explicitly recognized that the court had jurisdiction over as-applied challenges to permit conditions. See No. 259-11-07 Vtec, at 5.

¶ 49. The distinction in <u>Britting</u> and <u>Fitzsimonds Road</u> is consistent with the statutory scheme, while that in <u>Umpire Mountain</u> is not. The Environmental Division has jurisdiction to address as-applied constitutional challenges to permits because those claims are appeals of "an act or decision of the Secretary." 10 V.S.A. § 8504(a). Questions about easements could fall outside of this jurisdiction, as they did in <u>Britting</u>, where the plaintiff requested what amounted to an advisory opinion about the legal duty to obtain an easement. But a question about an easement is not inherently outside of the scope of the court's jurisdiction where it is the basis for an appeal of an act or decision of the ANR.

¶ 50. Here, plaintiffs' physical takings claim was an as-applied challenge to the isolation requirements in the permit. Plaintiffs argued that the permit was "invalid because it seeks to impose an illegal easement <u>on Crowley</u>," and that the permit was "invalid <u>as it applies to Crowley</u>." Appellant's Third Amended Statement of Questions at 1, <u>DJK, LLC WW & WS Permit</u>, No. 21-ENV-00046 (Vt. Env't Ct. Oct. 3, 2022) (emphasis added). As in <u>Britting</u>, the claim therefore arose as an appeal of "an act or decision of the Secretary," 10 V.S.A. § 8504(a), and is within the court's jurisdiction. Because the relevant statutes recognize jurisdiction over as-applied constitutional challenges to wastewater permit isolation distances, I would hold the court erred in declaring that it lacked jurisdiction.[8]

---

[8] While I believe that the court erred in its jurisdictional conclusions, it is less clear that any harm resulted from this error. Despite its conclusion on jurisdiction, the court went on to fully address plaintiffs' claim under <u>Cedar Point Nursery</u> as a per se regulatory taking. Since this was plaintiffs' sole takings claim, it appears that the court's order fully addressed plaintiffs' claims.

## B.  The Property Interest at Stake

¶ 51.  The majority next concludes that the Environmental Division acted appropriately in holding that "as a matter of law, the possible restriction on Appellants' free use of groundwater within the isolation zone cannot be a constitutional taking because Appellants do not have an absolute private property interest in groundwater."  But while the court was correct that the Legislature has abolished the "common-law doctrine of absolute ownership of groundwater," 10 V.S.A. § 1410(a)(5), it does not follow from this premise that property owners have no constitutionally protected property rights in underlying groundwater.  Indeed, the same statute confirms that "all persons have a <u>right</u> to the beneficial use and enjoyment of groundwater free from unreasonable interference by other persons."  <u>Id</u>. § 1410(a)(4) (emphasis added).  The State is charged with managing this resource "for the benefit of citizens who <u>hold and share rights</u> in such waters."  <u>Id</u>. § 1390(5) (emphasis added).  Thus, while the Legislature has abolished absolute ownership of groundwater, it has reaffirmed that individuals still have the right to reasonable use of groundwater.  Where governmental action infringes on this right, it is subject to a takings claim.

¶ 52.  Courts have termed this right to the reasonable use of groundwater a "usufructuary" right.  See, e.g., <u>Woodsum v. Pemberton Twp.</u>, 412 A.2d 1064, 1071 (N.J. Super Ct. Law Div. 1980) ("[T]here is no proprietary interest in ground water only a usufructuary interest."); <u>BSK Enters., Inc. v. Beroth Oil Co.</u>, 783 S.E.2d 236, 250 (N.C. Ct. App. 2016) (recognizing that "water is a usufruct," carrying "the right only to a reasonable and beneficial use of the waters upon the land or its percolations"); <u>Robinson v. Ariyoshi</u>, 658 P.2d 287, 306 (Haw. 1982) (stating that water rights are "uniformly regarded as usufruct[ua]ry and correlative in nature"); see <u>Usufruct</u>, Black's Law Dictionary (11th ed. 2019) (defining usufruct as "[a] right for a certain period to use and enjoy the fruits of another's property without damaging or diminishing it").  Usufructuary rights in water are "generally appurtenant to the land on which the water is beneficially used."  78 Am. Jur. 2d <u>Waters</u> § 7 (2024); see, e.g., <u>Dermody v. City of Reno</u>, 931 P.2d 1354, 1358 (Nev. 1997) ("[W]ater rights are appurtenant to benefitted land.").  While usufructuary rights in water do not imply

22

ownership, they still "confer[] the legal right to use the water that is superior to all other users." 62 Cal. Jur. 3d Water § 370 (2024); see also 78 Am. Jur. 2d Waters § 6 (stating that while water right is "usufructuary," it is still "a property right and is considered real property").

¶ 53. Thus, in the context of usufructuary riparian rights, the U.S. Supreme Court has previously held that "if any part of respondents' claimed water rights were invaded it amounted to an interference therewith and a taking thereof." Dugan v. Rank, 372 U.S. 609, 623 (1963); see also 62 Cal. Jur. 3d Water § 370 ("Both riparian and overlying water rights are usufructuary only."). This is because an interference with usufructuary rights in water results in "depriving the owner of its profitable use," thereby creating "a servitude as would constitute an appropriation of property for which compensation should be made." Dugan, 372 U.S. at 625 (quotation and alterations omitted).

¶ 54. Several other state courts have held that property owners hold rights to underlying groundwater, and that this right can be taken within the meaning of the Fifth Amendment. See McNamara v. Rittman, 2005-Ohio-6433, ¶ 10, 838 N.E.2d 640 ("Ohio recognizes that landowners have a property interest in the groundwater underlying their land and that governmental interference with that right can constitute an unconstitutional taking."); Edwards Aquifer Auth. v. Day, 369 S.W.3d 814, 833 (Tex. 2012) ("Groundwater rights are property rights subject to constitutional protection, whatever difficulties may lie in determining adequate compensation for a taking."); State by State Hwy. Comm. v. Ponten, 463 P.2d 150, 155 (Wash. 1969) (holding that "there is a property right (correlative though it may be) in percolating waters"); Mich. Citizens for Water Conservation v. Nestle Waters N. Am., Inc., 709 N.W.2d 174, 221 (Mich. Ct. App. 2005) ("[P]rivate persons obtain property rights in water on the basis of their ownership of land."); Williams v. City of Wichita, 374 P.2d 578, 594 (Kan. 1962) ("The privilege of using water is unquestionably an element of the value of the land."). While many of these states apply different rules for ownership of groundwater, the Ohio Supreme Court's decision in McNamara is instructive given that the state applies a similar "reasonable use" doctrine for groundwater. 2005-

23

Ohio-6433, ¶ 14. Faced with the certified question of whether Ohio landowners have a property interest in underlying groundwater as necessary to the use and enjoyment of their land, the court answered in the affirmative and concluded that "governmental interference with that right can constitute an unconstitutional taking." Id. ¶ 34. The same is true under our law; the fact that Vermont property owners no longer have the benefit of the "common-law doctrine of absolute ownership" of underlying groundwater does not prohibit a takings claim based on government actions that interfere with their reasonable use.

¶ 55. It is clear from the facts here that the isolation zone imposes limitations on plaintiffs' use of the groundwater on their property and that these limitations go beyond the general limitations that apply to all property owners. Defendant's wastewater permit states that "[a]dherence to all isolation distances that are set forth in the Wastewater and Potable Water Supply Rules is required." As the court stated, "the standard isolation zone required by the Rules extends, or overshadows, onto a portion of" plaintiffs' property, amounting to "approximately 10 percent of" plaintiffs' total lot. On this portion of their property then, plaintiffs are now forbidden altogether from accessing groundwater. Furthermore, the permit is statutorily required to be "properly indexed and recorded in the land records pursuant to 24 V.S.A. §§ 1154 and 1161." 10 V.S.A. § 1973(h). For wastewater permits, the State "shall be listed as the grantee" of the property, while "[e]ach owner of record title to the property at the time such an instrument is issued shall be listed as the grantor." 24 V.S.A. §§ 1154(a)(8), 1161(b). Thus, the permit and its restrictions will be listed in the town records and disclosed to any prospective purchasers of plaintiffs' land. The State's actions must therefore be analyzed as potential takings.[9]

_____

[9] Again, despite concluding that plaintiffs had no property interest at stake, the court went on to consider the merits of plaintiffs' takings claim under Cedar Point Nursery. Although I view the court's conclusion on this point to be in error, I agree with the overall judgment because plaintiffs failed to show that there was any physical invasion of their property, their sole claim for relief.

I also stress that in this context, as with any other, the Vermont Constitution permits government takings only when "necessity requires it." Vt. Const. ch. I, art. 2; see also Williams

24

¶ 56. In sum, because plaintiffs have not made out their sole takings claim, I am led to agree with the majority's disposition of this case. Nevertheless, I disagree with much of the majority's reasoning. The Environmental Division had jurisdiction to consider whether the permit imposed an easement on plaintiffs' property because the question arose in the context of an as-applied constitutional challenge to the permit. And the fact that the Legislature has abolished absolute ownership of groundwater does not mean that plaintiffs have no property interest that could be the subject of a takings claim. Accordingly, while I concur in the judgment, I respectfully dissent from the majority's reasoning.

¶ 57. I am authorized to state that Justice Eaton joins this concurrence.

_____

Chief Justice

_____

v. School Dist. No. 6 in Newfane, 33 Vt. 271, 276 (1860) (recognizing that the Vermont Constitution "prohibit[s] the taking of private property, except for necessary public use").