VERMONT SUPERIOR COURT

Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



Docket No. 23-ENV-00007

---

In re: 15 Bull Moose[1] Wastewater &
    Water Supply Permit Appeal

---

## DECISION ON THE MERITS

Alexis Maizel ("Applicant") owns about 76 acres that are located at the junction of Bull Moose Road and Mud City Loop in the Town of Morristown, Vermont. The portion of the property to the west of Bull Moose Road hosts a pre-existing farm store for which Applicant now wishes to install a wastewater treatment system. Applicant sought and received approval for an on-site wastewater treatment system from the State of Vermont Agency of Natural Resources ("ANR"), Department of Environmental Conservation("DEC"). When DEC issued its approval, with conditions, (Permit No. WW-5-9129), neighbor Selina Rooney ("Appellant") filed a timely appeal with this Court.

Applicant is represented in these proceedings by Attorney Brice Simon, Esq. ANR participated in these proceedings and is represented by Attorney Kane Smart, Esq. Appellant chose to represent herself in these proceedings.

The Court afforded the parties some time to investigate a voluntary resolution of their legal disputes. When those efforts did not prove successful, the Court set the matter for a one-day trial, through the use of the WebEx remote video conferencing system. The trial was completed that same day (December

---

[1] This caption name appears to be taken from Applicant's WW & WS Permit Application, a copy of which was admitted at trial as Applicant's Exhibit E. However, a review of the application suggests that this address references Applicant's nearby home address; her home appears to be located on the easterly side of Bull Moose Road, near its junction with Mud City Loop. Both the proposed wastewater treatment system, as well as the farm store it is planned to serve, is located on a portion of Applicant's property to the west of Bull Moose Road, on the southerly side of Mud City Loop. We maintain this caption name to align with the name provided in the application and Permit.

19, 2023). The parties then requested to have an opportunity to file post-trial legal memoranda; the Court granted that request and this matter became ripe for our consideration after January 29, 2024.

Based upon the credible testimony and other evidence presented at trial, the Court renders the following Findings of Fact, Conclusions of Law, and the Judgment Order which accompanies this Merits Decision.

## FINDINGS OF FACT

1. Applicant owns a parcel of land containing about 76 acres that can be identified as three sub-parcels along Mud City Loop in the Town of Morrisville. Applicant's property is partially depicted on her Exhibit D.

2. One parcel is located easterly of Bull Moose Road and on the southerly side of Mud City Loop. This parcel contains Applicant's primary residence.

3. A second sub-parcel is also located on the southerly side of Mud City Loop and to the west of Bull Moose Road. This sub-parcel contains an existing farm store that Applicant operates. It is on this sub-parcel that Applicant proposes to install an on-site wastewater treatment system that will be used to support the existing farm store.

4. The third sub-parcel is located on the northerly side of Mud City Loop, across from Applicant's two other sub-parcels. This third sub-parcel does not contain any existing or proposed improvements.

5. At the time of the filing of her application, Applicant had operated her farm store on the second sub-parcel for about two years. She has used the farm store to sell goods and produce from her nearby farm.

6. The store is located near the northwestern corner of that second sub-parcel, which abuts Mud City Loop to the north, Applicant's third sub-parcel across Mud City Loop, and property of her neighbor, Selina Rooney ("Appellant") to the west. A second neighbor (Mr. Bidwell) owns property to the north of Mud City Loop, across from Ms. Rooney's property.

7. Mr. Bidwell has not chosen to participate in this appeal.

8. Applicant and her engineer determined that, in their judgment, the preferred location for her proposed on-site wastewater treatment system would

be near the northwesterly corner of the second sub-parcel. This location would be near her existing farm store (for which it was planned to serve) and down-slope of the store, so as to afford a gravity-driven feed of wastewater into the proposed septic tank and leach field.

9. Applicant's engineer arranged for test pits to be dug in the area designated for the proposed system. The percolation tests employed in these test pits provided evidence of satisfactory drainage from the test pits.[2]

10. While there is a mapped wetland on Appellant Rooney's property (with a small portion located in the southwesterly corner of Applicant's second sub-parcel), the area where Applicant and her engineer propose to locate the wastewater treatment system does not include any mapped wetlands. The engineer's investigation revealed that where the system is proposed, the soils are very "stony" and include about a 6% slope. See Applicant's Exhibit E. The engineer installed and monitored percolation test pits in the proposed system location, to confirm the appropriateness of the area soils.

11. While DEC was reviewing Applicant's permit application, Appellant chose not to express any concerns to DEC about possible impact upon area wetlands or hydraulic soils. There was no credible evidence presented at trial that Applicant's proposed wastewater treatment system will have any measurable adverse impacts upon area wetlands or hydraulic soils.

12. The proposed wastewater treatment system, including the septic tank, leach field, and piping will all be wholly located on Applicant's second sub-parcel, and will respect all applicable zoning regulations, including setback restrictions.

13. Applicant's engineer credibly testified that the design and location of the proposed system complies with applicable DEC regulations and assures adequate treatment of wastewater as it migrates into the groundwater.

14. Applicant's expert also credibly testified that his observations from Applicant's property and from the adjoining roadways did not reveal any

---

[2] The location of the three test pits are shown on Applicant's Exhibit D. Such test pits and percolation samples are used to determine whether the soils in which the test pits are dug will provide drainage of water from the soils sufficient to support the proposed wastewater treatment system.

improvements on the neighbors' properties that could be affected by Applicant's proposed wastewater treatment system.

15. Applicant's engineer designed the system to employ a "Presby septic system" as part of a "mound system." A mound system usually requires the importation and mounding of new soils above the proposed leach field. A Presby system is thought to improve the processing of wastewater through the use of piping in the leach field that retains solids and treats the effluent with bacteria before it is discharged into the nearby soils.

16. Applicant has an existing drilled water well that serves her home on sub-parcel one. She proposes to install underground piping and use her existing home well to supply potable water to her farm store.

17. Based upon these recommendations, Applicant completed an application for a wastewater system and potable water supply permit.

18. Pursuant to the applicable DEC regulations, Applicant provided the owners of adjoining properties with notice of her intent to submit an application for her proposed wastewater treatment and potable water supply systems, including neighbors Appellant Rooney and Mr. Bidwell. The notice that Applicant provided to her neighbors was introduced as Exhibit B.

19. Applicant's notification to her neighbors advised that, pursuant to DEC regulations, she include a photocopy of the site plan depicting Applicant's proposed wastewater treatment system. The photocopy of Applicant's site plan was reduced in size so as to be easily included in the mailing to her neighbors. A copy of that site plan was admitted at trial as Exhibit C.

20. The DEC regulations require that an applicant's site plan depict a "presumptive isolation zone" around a proposed wastewater treatment system. Applicant's proposed wastewater treatment system and the presumptive isolation zone imposed by DEC regulations are depicted on Exhibit D. As noted on Exhibit D, the presumptive isolation zone extends partially onto neighbors Rooney and Bidwell's properties.[3] The portion of the presumptive isolation zone

---

[3] Exhibit D only shows a presumptive isolation zone around Applicant's proposed wastewater treatment system, since her source for potable water for the farm store will come from an existing well already serving her nearby residence to the east of Bull Moose Road.

that is on Appellant's property is outlined with an orange highlighter; the portion on Mr. Bidwell's property is outlined with a red highlighter, all as depicted on Exhibit D.

21. The purpose of the presumptive isolation zone, as stated by DEC's Drinking Water and Groundwater Protection Division ("DWGWPD") regulations, are to "protect human health by preventing contamination" of a drinking water source. See Exhibit B at 1. While DWGWPD initially recommends that a drinking water well "should not be located "within a presumptive isolation zone," affected neighbors may request that DEC provide a more specific determination of the actual isolation zone necessary to protect public health. In essence, a presumptive isolation zone is a preventative measure.

22. Appellant chose not to request that DEC calculate the portion of an actual isolation zone that incumbers her property. An actual isolation zone calculation would have determined, based upon soil investigations, what portion, if any, of the isolation zone would encumber Appellant Rooney's property. Since Applicant's neighbor did not make such a request, no such calculation was made.

23. The applicable DEC regulations also require neighbors receiving notice of a pending application to advise whether they have a water supply or wastewater disposal system on their neighboring properties that may be impacted by the proposed wastewater system or the presumptive isolation zone imposed by DEC regulations.

24. Appellant Rooney did not provide notice of any existing water supply or wastewater system on her property that may be impacted by Applicant's proposed wastewater system or the presumptive isolation zone imposed by DEC regulations.

25. At trial, Appellant asserted that a water supply well was located on her property within the presumptive isolation zone. This well once served a building that has since been removed from her property. Ms. Rooney also asserted that this old spring has been used as a source of water for cows that grazed on her property. There was no credible evidence presented at trial that an operating

spring well now existed on Appellant's property that was within the presumptive isolation zone.

26. At trial, Appellant expressed concerns that untreated or inadequately treated wastewater from Applicant's proposed wastewater treatment system would travel with groundwater onto her property. However, there was no credible evidence presented at trial that untreated or inadequately treated wastewater from Applicant's proposed wastewater treatment system would actually travel onto Appellant's property.

27. DEC did not visit the site of Applicant's proposed wastewater treatment system and did not require the system site to be flagged.

28. Once Applicant presented her application to DEC and provided notice to her neighbors, DEC granted Applicant wastewater system and potable water supply permit No. WW-5-9129 on November 8, 2021. Appellant filed a timely notice of appeal from that permit with this Court.

## Conclusions of Law

Appeals from DEC determinations on applications for wastewater and potable water supply system permits are made to this Court and considered on a *de novo* basis. In re Musto Wastewater System, 2014 VT 103, ¶ 3, 197 Vt. 514. . In order to present legal issues for our consideration in such appeals, an appellant must file a statement of questions. V.R.E.C.P. 5(f). In this appeal, Appellant filed her Statement of Questions on April 10, 2023. Appellant's Statement of Questions contains 20 Questions, with sub-questions and detailed over six pages. During trial, the Court afforded each party the opportunity to review each of Appellant's Questions. Due to their length, we have summarized below the legal issues presented in each Question.

Question 1: Appellant asserts that Applicant's site map is not drawn to scale. At trial, it became clear that Applicant's site map was actually drawn to scale. Appellant's confusion arose because the engineer provided a reduced photocopy of the site map in his mailing to Appellant. The actual scale on this photocopy accurately depicts the distances on the site map. The scale is only deceptive when one attempts to only employ the written scale 1" = 60' to the reduced

photocopy. We conclude that the photocopy provided to Appellant accurately depicts Applicant's site plan.

Question 2: Appellant's Question 2 asks why does Applicant's site plan not depict the alleged potable water spring on Appellant's property, within the isolation zone. There is no dispute that Applicant's site plan does not identify an alleged spring well on Appellant's property within the presumptive isolation zone. See Exhibits C-1 and C-2. It became clear at trial that the reason why no such spring well is identified on Applicant's property is because no such spring well was discernable from the engineer's off-site inspection of the area, and that Appellant failed to disclose that such a spring well was located within the presumptive isolation zone on her property, as required by DEC regulations, when she received notice of the pending application. It was only at trial that Appellant asserted that such a spring well existed. The credible evidence presented at trial was that while a spring well may have once existed on her property, that spring well either no longer exists or is not discernable by a site inspection. In any event, Appellant failed to comply with DEC regulations that required her to specifically identify any claimed water sources within the presumptive isolation zone. In response to Appellant's Question 2, we conclude that these circumstances do not require a denial of Applicant's wastewater permit application.

Question 3: Appellant asserts that the proposed wastewater treatment system "was put in the wettest area of the" adjoining fields and that for this reason, the pending application should be denied. The credible evidence presented at trial belied these assertions. In fact, the wetland that Appellant references is mostly on her property, not Applicants, and is nowhere near the proposed wastewater system site or the presumptive isolation zone identified on either Appellant's or Applicant's property. Applicant's expert credibly testified that the soils on and around the system site are not hydric and do not evidence a presence within a wetland. See Applicant Exhibit E.

In fact, Applicant's expert credibly reported that at the proposed site, there is at least sixteen inches of soils before the evidenced seasonal high water table,

and that both the mound system and the proposed Presby system will provide adequate filtration and treatment for the wastewater that would enter the proposed system. The details for the proposed system are provided on Applicant Exhibits C-1 and C-2.

The expert also credibly noted that if Appellant had concerns about the presence of a possible wetland or a wetland buffer, she could have contacted ANR's wetlands experts to determine whether a wetland reclassification was warranted. Appellant failed to assert that claim and no wetland reclassification has occurred.

For all these reasons, we conclude that Appellant has not presented a basis for denying the pending application in this Question 3.

Question 4: Appellant asserts in her Question 4 that the pending application should be denied because Applicant has not received a Vermont Agency of Agriculture RAP designation for her farm. We conclude that this Question is beyond the scope of our limited jurisdiction in this appeal of a wastewater permit determination and therefore decline to address it here.

Question 5: By this Question, Appellant challenges the constitutionality of the DEC imposition of a presumptive isolation zone on a neighbor's property, "thereby limiting what [the neighbor] can do on their property in the future . . . [and] unfairly . . . restrict[ing] the potential use of Appellant's property [and whether] this permit affect[s] Appellant's property rights or impermissibly encumber Appellant's property?" Appellant's Statement of Questions, filed April 10, 2023, at p. 2.

Appellant's fears are mostly misplaced. The applicable DEC regulations limit only a small fraction of her rights to use and develop her property that lies within the presumptive isolation zone: that is, the only limitation is upon the right to locate a new potable water supply source within the presumptive zone. See Applicant's Exhibit B(noting that the "presumptive isolation zone" around a proposed wastewater system established by DWGPD regulations merely requires that "a well should not be located" within the zone, "to protect human health by

preventing contamination of a well."). There are no other property rights restrictions within the DWGPD regulations within a presumptive isolation zone.

As noted above, a neighbor may request a more specific determination of an actual isolation zone and request a further limitation or variance upon the new well location restriction. Appellant chose to not pursue these alternatives.

The constitutionality of placing presumptive isolation zones on a neighbor's property have been the subject of several appeals to this Court, and we can understand why, since at first blush, the regulations appear to restrict a neighbor's use of their property. But our Supreme Court has recently addressed such constitutional challenges in In re DJK, LLC WW & WS Permit Appeal, 2024 VT 34. As in the case at bar, neighbors in the DJK appeal (the Crowleys) challenged a wastewater permit provided to an applicant that identified a "presumptive isolation zone" that encroached onto the Crowleys' property. The Court concluded that the isolation zone established by DWGPD regulations merely limited the Crowleys' ability to locate a new water well within the zone, and further noted that the applicable regulations allowed for affected neighbors, such as the Crowleys, to petition for a reduction in the isolation zone or an exemption from the water well restriction. Id. at ¶ 4. As here, the Crowleys chose neither of those alternative courses.

In essence, the DJK court concluded that the only restriction created by the applicable DWGPD regulations is upon an unrestricted access to groundwater. Id. at 36-37. The Court repeated the conclusion of this Court that access to groundwater is not recognized as an individual right, but rather as a right held in trust for the general public and managed for all Vermonters. Id. In conclusion, the DJK Court rejected the Crowley's constitutional claims and concluded that there had been "no taking" as a consequence of the applicable DEC regulations.

Much like in the DJK appeal, we reject Appellant's constitutional challenge and conclude that there has been no impermissible taking by imposition of a presumptive isolation zone on Appellant's property. Appellant here chose not to lessen the limited impacts upon her rights by requesting a calculation of the

actual isolation zone and failed to show how the zone's implementation would limit the actual use and enjoyment of her property. For all these reasons, we conclude that we must answer Appellant's Question 5 in the negative.

Question 6: By her question 6, Appellant appears to assert that she enjoys a "prescriptive easement" across Applicant's property and that such easement should prohibit DEC from granting the pending application. Applicant chose not to identify this alleged prescriptive easement in response to the Notice provided to her (Exhibit B), and Appellant's testimony at trial was not compelling. In fact, at one point during her testimony, Appellant Rooney stated that the prescriptive easement issue she was asserting "is now a moot point."

There was no evidence at trial that Appellant has presented her claim of a prescriptive easement to a court of competent jurisdiction. More importantly, the limited jurisdiction we enjoy in this appeal from a wastewater permit determination does not allow this court to adjudicate private property rights. We decline to do so here. For all these reasons, we decline Appellant's suggestion that the pending application should be denied for these reasons.

Question 7: Appellant questions here whether the pending application must be denied because Applicant was not required to "flag" the perimeter of the proposed mound system or to maintain the flagging during the pendency of the application. Appellant misconstrues the directives of the DWGPD regulations. Applicant's expert credibly testified that DEC officials did not request or direct that he flag the proposed system and did not object when he did not do so. Similarly, even though the DWGPD regulations authorize DEC officials to inspect and enter onto a system site, no DEC officials chose to do so. We find no provisions in the DWGPD regulations that require that a permit denial is a necessary consequence of these omissions. In fact, during her trial testimony, Appellant stated that Applicant's engineer had adequately "answer[ed] that question." We therefore answer Appellant's Question 7 in the negative.

Question 8: Appellant asks by this Question whether the wastewater permit "impermissibly authorize[s] use of or trespass onto Appellant's property?" No rational interpretation of the issued permit or the DEC regulations under which

the permit was issued can support such an assertion. There is no provision in the permit that authorizes a physical entrance onto Appellant's property. There was no evidence presented at trial that Applicant or her expert ever actually entered onto Appellant's property, nor any evidence that they attempted to do so.

Appellant appeared to suggest that the imposition of a presumptive isolation zone on her property constitutes a "trespass" upon her property. And yet, Appellant offered no statute or caselaw interpretation to support this claim. The DJK Court responded to a similar claim by noting that Vermont has adhered to the "first in time" approach of authorizing a permit to an applicant who first applies for a wastewater or potable water supply permit. DJK, 2024 VT 34 at ¶ 5:

> See "A Review of the 'Overshadowing' of Water Supply-Wastewater System Isolation Distances," Report of the Technical Advisory Committee to the Vermont Legislature, at 1, 47-50, App. 8.4 (Jan. 15, 2010) [hereinafter TAC Report] (recognizing that Vermont, like most New England states, uses first-in-time approach to wastewater system and potable water supply permitting when first permit approves isolation zone overshadowing one or more neighboring properties), https://dee.vermont.gov/sites/dee/files/dwgwp/rotac/pdf/2011.01.15.tacovershadowingrep.pdf [https://penna.cc/5EFQ-4XBE]. This "approach has been used since the Agency of Natural Resources began issuing permits for water and wastewater systems starting in 1969." Id. at 1. At the request of the Legislature, the Technical Advisory Committee "examined alternative approaches," and "[a]fter considering the effect of these approaches," it "strongly recommend[ed] retaining the first-in-time approach." Id.

As with the case at bar, the neighbors' property in DJK was undeveloped at the time the wastewater application was filed.

Furthermore, Appellant here failed to identify a property interest that was encroached upon by the proposed presumptive isolation zone. The only restriction imposed upon Appellant is a presumptive restriction upon installing a new well to withdraw groundwater, a restriction that can be reduced or eliminated, if Appellant had chosen to make such a request. As is true here, the neighbor was advised by the DJK Court that they could "'construct houses,

garages, and driveways within the presumptive isolation zone' and that '[neither the legislature nor the Rules authorize or require the [DEC] to deny a permit application when presumptive isolation zones extend onto [neighboring] property.'" Id. at ¶ 7.

For all these reasons, we Answer Appellant's Question 8 in the negative.

Question 9: By this Question, Appellant asked whether "the permit and isolation zone deprive neighboring landowners of their property rights by creating an unauthorized and unlawful easement, encroachment, or restrictive covenant?" We find this Question to be one of the more fanciful assertions in Appellant's Statement of Questions; it is a fanciful assertion with no factual or legal foundation offered at trial.

First, the only restriction provided by the permit is a presumption that Appellant may not install a water well within the presumptive isolation zone; a restriction that Appellant could have requested be reduced or eliminated. But Appellant chose not to file such a request.

Second, we must note, and the DJK Court highlighted similar conclusions by the lower court there, that the groundwater resources within Vermont do not constitute a private property right, but rather a right "held in trust for the public." See, 10 V.S.A. § 1390. A restriction on the ability to extract groundwater within the presumptive isolation zone does not prohibit, interfere, or deprive them of all economic use of their property.

For all these reasons, we must answer Appellant's Question 9 in the negative.

Question 10: Appellant asks by this Question whether "the permit and resulting isolation zone impermissibly lower the land values of the affected neighbor's land?" There was no evidence presented of such an impact, and such evidence was not allowed at trial because such a question was well beyond the jurisdictional authority of this Court in an appeal of a wastewater permit determination. We therefore decline to address this Question, since it is beyond the scope of our limited jurisdiction here.

<u>Question 11</u>:  By this Question, Appellant asserted that it is "unlawful" for DEC "to issue a permit that will deprive farmers of their property rights . . .."  We have already addressed, and rejected, Appellant's unfounded assertions that the imposition of a presumptive isolation zone somehow deprives a neighbor of some unspecified "property rights."  We need not repeat our analysis here.  Appellant chose not to offer any foundation at trial for her unsubstantiated assertion that the DEC permitting process "disparately impact farmers by rendering a portion of agricultural land unsuitable, and thereby directly harming their business."  There is no provision in the applicable DEC regulations that renders agricultural land unsuitable.  For all these reasons, we answer Appellant's Question 11 in the negative.

<u>Question 12</u>:  Appellant asks by her Question 12 whether the state-issued permit "violate[s] article 9 of the Vermont Constitution.  Ms. Rooney provided no specificity in this Question, and chose to not offer any specificity at trial, either.  We are therefore left on our own and only with the evidence offered by Applicant when we go about addressing this Question.

Article 9 of the Vermont Constitution reads, in broadly relevant part, as follows:

> That every member of society hath a right to be protected in the enjoyment of life, liberty, and property, and therefore is bound to contribute the member's proportion towards the expen[se] of that protection, and yield personal service, when necessary, or an equivalent thereto, but no part of any person's property can be justly taken, or applied to public uses, without the person's own consent, or that of the Representative Body, . . ..

Vt. Const. Art. 9

We assume that Appellant decided to cite to Article 9 because of its protection that "no part of any person's property can be justly taken, or applied to public uses, without the person's own consent, . . .."

Because of our prior analysis that Appellant has not been deprived of a property right by operation of the permit issued to Applicant, we conclude that there has been no violation of the rights protected by Article 9 of the Vermont Constitution.  We therefore answer Appellant's Question 12 in the negative.

Question 13: Appellant asserts that the DEC-issued permit violates the 14th amendment of the U. S. Constitution "by depriving Appellants [sic] of property without due process of law" and "because the ANR adjudication violated the Rooney's [sic] procedural due process rights . . ., since the permit effectively deprives the Rooney's [sic] of property rights and their right to access water, and because the Rooney's [sic] were not given any opportunity to be heard prior to the approval of the permit."

The factual foundation for Appellant's legal claims in this Question are baseless and without merit, much like in several prior Questions. As we have already determined, the issued permit does not deprive Appellant of property rights and does not deprive Appellant of access to water from her property. At trial, Appellant provided no credible evidence to support her claims.

The unchallenged and credible testimony and other evidence presented at trial convinced this Court that the factual representations Appellant makes in her Question 13 are patently false. Appellant was provided with written notice as soon as Applicant submitted her application, as evidenced by the notice admitted at trial as Exhibit B. This notice also advised how she could express her concerns about Applicant's proposed wastewater system, particularly whether she has an existing water source that may be impacted that was not identified on the materials that Applicant submitted. Appellant chose to not respond to this notice. Appellant also could have expressed any concerns she had about the proposed project to DEC as they began review of Applicant's application. These procedural due process rights were afforded to Appellant, but she chose not to exercise any of them.

For all these reasons, we answer Appellant's Question 13 in the negative.

Question 14: Appellant first asserts in Question 14 that "the permit . . . constitute[s] an uncompensated and unlawful taking in violation of" the applicable state and federal constitutions. We have already addressed these constitutional claims in our analysis of Questions 5, 8, and 9, where we specifically reviewed the Vermont Supreme Court DJK decision. The challenged permit does not constitute an uncompensated or unlawful taking under any

interpretation of the applicable constitutional caselaw of which we are aware. Appellant offered no legal analysis of her claims.

Appellant also asserts in her Question 14 that the permit should be deemed "invalid due to false/misleading information on the application . . .." Appellant's representation here are incorrect. The application contains no substantiative misrepresentations; certainly no misrepresentations that would require this Court to deny the pending application.

For all these reasons, we must respond to Appellant's Question 14 in the negative.

Question 15: Appellant asserts in her Question 15 that the permit must be deemed invalid "because the innovative and alternative technology general use approval permit for the Presby systems expired on 5-1-2023." At trial, Applicant's engineer credibly presented testimony that this general permit had been extended. Thereafter, Appellant represented that these claims "were now moot" and we should disregard this challenge. We therefore answer Appellant's Question 15 in the negative.

Question 16: By her Question 16, Appellant asks whether "the permit and the regulatory scheme that allows overshadowing violate multiple provisions of 10 V.S.A. Chapter 48 . . ." and then goes on to specifically reference 10 V.S.A. §§ 1410 and § 1390. In support of her suggestion that there have been violations of Chapter 48, Appellant asserts that "the permit and the resulting isolation zone cuts off the Rooney's [sic] ability access or use water from their overshadowed land, thus unreasonably interfering with the Rooney's [sic] ability to use, access, and enjoy the groundwater."

We do not get to an analysis of whether there have been violations of 10 V.S.A. Chapter 48 because Appellant failed to present any credible evidence that her ability to access groundwater on her land will be restricted or interfered with in any substantive way.

As noted above, the applicable regulations offered Appellant an opportunity to request a determination of the actual isolation zone and to what extent it actually encumbers her property. She chose not to request or explore

this.  Further, those same regulations allow any affected neighbor to request an exemption or variance from what is the only restriction, if any: to groundwater within the actual isolation zone.

Given the absence of any credible evidence presented by Appellant, we are left to wonder whether her access to groundwater will be encumbered at all, once an actual isolation zone is established and when Appellant exhausts her efforts to seek a variance or exemption.

Incredibly, in her Question 16, Appellant asserts that "the regulatory scheme . . . prioritizes development while sacrificing the quality of the groundwater . . . [and] forfeit[s] the protection of groundwater in order to promote development . . .."  The credible trial evidence established quite the opposite.  ANR and its officials have done a commendable job of protecting Vermont's groundwater, especially reaffirming groundwater as a valuable asset to be protected for all Vermonters.  The rules establishing isolation distances around water wells and septic systems are meant and actually do protect the groundwater from contamination.  The isolation zones operate as a preventative measure, not an encouragement of development, so that Vermonters can be more assured that their water sources can be safe and protected.

The last point that Appellant makes in her multi-paragraphed, multi-paged Question 16 is her assertion that "the permit and the adjoining regulatory scheme . . . [should] be invalidated since it creates a tragedy of the commons that encourages people to excessively use and abuse the State's groundwater resources, thus contributing to further violations of 10 V.S.A. Chapter 48 . . .."

The tragedy of the commons is a phrase often used in commentary that compares common access to the ultimate loss of public resources.  Here is one definition of the term:

> The tragedy of the commons is a metaphoric label for a concept that is widely discussed, and criticised [sic], in economics, ecology and other sciences.  According to the concept, should many people enjoy unfettered access to a finite, valuable resource such as a pasture, they will tend to overuse it and may end up destroying its value altogether.  Even if some users exercised voluntary restraint, the other users would merely supplant them, the predictable result a tragedy for all.

The metaphor is the title of a 1968 essay by ecologist Garrett Hardin. As another example, he cited a watercourse which all are free to pollute. The concept itself did not originate with Hardin, but rather extends back to classical antiquity, being discussed by Aristotle.

From the public encyclopedia Wikipedia, https://en.wikipedia.org/wiki /Tragedy_of_the_commons.

The permit applied for here and the ANR regulations that led to its approval represent public action to protect against the operation of the tragedy of the commons in regard to Vermont groundwater. The applicable regulations protect our groundwater from unfettered use and pollution. At trial, Appellant did not offer any evidence to support her assertion here, and we are therefore left to wonder about her accusation.

For all these reasons, we answer all the issues Appellant raises in her Question 16 in the negative.

Question 17: By her Question 17, Appellant asks whether "the permit and the resulting isolation zone violate the Vermont Groundwater Protection Rule[s] and Strategy?" This is nothing more than a rehashing of Appellant's prior assertions, all of which we have rejected. The only additional point Appellant made on this issue at trial was a baseless assertion that she believed the applicable regulations "benefit more affluent people."

All of Appellant's assertions in this Question are unsupported assertions that have no relevance to the legal issues presented by the pending application. At trial, Appellant offered no further evidence in support of these assertions.

For all the reasons detailed above, we answer Appellant's Question 17 in the negative.

Question 18: By her Question 18, Appellant asserts that the applicable wastewater regulations "violate 3 V. S. A. § 833(a) . . .." That statutory provision provides that "[r]ules and procedures shall be written in a clear and coherent manner using words with common and everyday meanings, consistent with the text of the rule or procedure." Id.

Other than quoting this statutory language, Appellant provided no credible explanation for how the applicable wastewater rules violate this statute. Having

received no evidence or explanation, we conclude that we must answer Appellant's Question 18 in the negative.

Question 19: By this Question, Appellant asked whether the permit issued by DEC is "invalid because the agency and applicant failed to verify whether the Rooney's [sic] will be able to access water, whether they will be able to access enough water to support their dairy and agricultural business, and whether they will be able to access enough clean water in the future?"

Appellant does not provide any citation to a statute, rule, or caselaw that creates a duty in an applicant to verify a neighbor's access to groundwater. At trial, Appellant simply stated her assertion in this Question was "clear and straight forward" and that she didn't have anything further to offer in support.

We find Appellant's assertions here particularly ironic, given that the applicable regulations obligated her to notify applicant of any pre-existing water source that may be impacted by Applicant's proposed wastewater system, and authorized Appellant to request a calculation of the actual isolation zone, to see if Appellant's supposed water source is even impacted by Applicant's proposed wastewater system. Further, Appellant had the right under the applicable regulations to request an exemption or variance from the limitations of locating a new water source within that recalculated zone. Since Appellant chose not to exercise those rights, we cannot conclude that Applicant's proposed wastewater system will impose any restraints upon Appellant's access to groundwater within an actual isolation zone.

We therefore conclude that the credible facts and applicable law require us to answer Appellant's Question 19 in the negative.

Question 20: As a final Question, Appellant asks whether "the permit and the resulting isolation zone present a risk to the water quality of the nearby stream, pond, and or wetland?? [sic] If so, will it violate the Vermont Water Quality Standards?" A wetland, mostly on Appellant's property, had been identified; a nearby stream or pond had not been identified.

At trial, we awaited Appellant's explanation and factual support for these assertions. We received none from her. Instead, as with her response in regard

to our inquiry about her Question 19, Appellant stated that this Question was "clear and straight forward" and that she didn't have anything further to offer.

Based upon the evidence presented, we conclude that there is no support for the accusations Appellant makes in her Question 20 and therefore answer that Question in the negative.

We have reviewed all of Appellant's twenty Questions, including the sub-questions contained therein, and have answered each Question that Appellant posed in the negative. Further, we conclude that Applicant has provided sufficient credible evidence, such that we conclude that her application for a wastewater and potable water supply permit must be **APPROVED**.

We therefore **AFFIRM** the DEC's issuance to Applicant of Permit No. WW-5-9129.

This completes the current proceedings before this Court concerning this appeal. A Judgment Order accompanies this Merits Decision.

Electronically signed at Brattleboro, Vermont on Monday, July 1, 2024, pursuant to V.R.E.F. 9(d).

Thomas S. Durkin, Superior Judge
Superior Court, Environmental Division